IN THE SUPREME COURT OF NORTH CAROLINA

No. 388A10

Filed 5 June 2020

STATE OF NORTH CAROLINA

v.

ANDREW DARRIN RAMSEUR

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order dated 3 June 2014 entered by Judge Joseph N. Crosswhite, Senior Resident Superior Court Judge, in Superior Court, Iredell County, dismissing defendant's motions for appropriate relief. Heard in the Supreme Court on 26 August 2019.

*Glenn Gerding, Appellate Defender, by Daniel K. Shatz and Andrew DeSimone, Assistant Appellate Defenders, for defendant-appellant.*

*Joshua H. Stein, Attorney General, by Jonathan P. Babb and Danielle Marquis Elder, Special Deputy Attorneys General, for the State-appellee.*

*Cassandra Stubbs for ACLU Capital Punishment Project, Burton Craige for North Carolina Advocates for Justice, and James Coleman and Irv Joyner for North Carolina Conference of the NAACP, amici curiae.*

EARLS, Justice.

Defendant, Andrew Darrin Ramseur, was convicted of two counts of first-degree murder and sentenced to death in 2010. After his trial, defendant filed a motion seeking relief pursuant to the newly enacted North Carolina Racial Justice Act on the basis that race was a significant factor in the decision to seek or impose the death penalty in his case. Before the trial court ruled on defendant's motion, the

General Assembly amended the Racial Justice Act in 2012 and then, in 2013, repealed the Racial Justice Act in its entirety. The trial court determined that this repeal rendered defendant's pending motion void and therefore dismissed defendant's Racial Justice Act claims. Here we are asked to decide the constitutionality of the retroactive application of the repeal of the Racial Justice Act. For the reasons stated herein, we hold that applying the repeal retroactively violates the constitutional prohibition on *ex post facto* laws, and therefore we reverse the trial court.

Background

On 31 December 2007, defendant was indicted for two counts of first-degree murder and one count of robbery with a dangerous weapon in connection with the 16 December 2007 murders of Jennifer Lee Vincek and Jeffrey Robert Peck. On the same day, the State filed a notice of its intent to seek the death penalty in defendant's case. Before trial, on 7 December 2009, defendant filed a "Motion for Change of Venue" based upon allegations of prejudice stemming from pre-trial publicity and racial tensions in Iredell County that were exacerbated by the fact that he was a black defendant accused of killing two white victims. In his motion, defendant alleged that the likelihood of a death sentence in Iredell County and the surrounding area was greater because of, *inter alia*, substantial pre-trial publicity and public comments including: the distribution to media outlets of surveillance footage of the crime, inflammatory media coverage of the case, and the prevalence of overtly racist comments and discussion on community internet blogs and websites. On a similar

basis, defendant simultaneously filed a "Motion to Continue Trial to Investigate Claim Pursuant to the Racial Justice Act" to examine whether the decision to seek the death penalty was free from racial discrimination.

The North Carolina Racial Justice Act (the RJA, or the Original RJA) was ratified by the General Assembly on 6 August 2009 and provided that "[n]o person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race." North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1214 [hereinafter Original RJA] (codified at N.C.G.S. § 15A-2010 (2009)) (repealed 2013). The RJA implemented a hearing procedure authorizing a defendant to raise an RJA claim either at the Rule 24 pretrial conference or in postconviction proceedings. *Id.*, § 1, 2009 N.C. Sess. Laws at 1214–15. Upon the filing of an RJA claim, the RJA mandated that "[t]he court shall schedule a hearing on the claim and shall prescribe a time for the submission of evidence by both parties." *Id.*, § 1, N.C. Sess. Laws at 1214. With respect to the evidence required to establish racial discrimination, the RJA placed the burden of proof on the defendant and provided, in pertinent part:

> (a) A finding that race was the basis of the decision to seek or impose a death sentence may be established if the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed.

> (b) Evidence relevant to establish a finding that race

was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed may include statistical evidence or other evidence, including, but not limited to, sworn testimony of attorneys, prosecutors, law enforcement officers, jurors, or other members of the criminal justice system or both, that, irrespective of statutory factors, one or more of the following applies:

> (1) Death sentences were sought or imposed significantly more frequently upon persons of one race than upon persons of another race.
>
> (2) Death sentences were sought or imposed significantly more frequently as punishment for capital offenses against persons of one race than as punishment of capital offenses against persons of another race.
>
> (3) Race was a significant factor in decisions to exercise peremptory challenges during jury selection.

*Id.*, § 1, 2009 N.C. Sess. Laws at 1214. When a defendant meets his evidentiary burden, and it is not successfully rebutted by the State, the RJA prescribes a remedy distinct to RJA claims:

> If the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed, the court shall order that a death sentence not be sought, or that the death sentence imposed by the judgment shall be vacated and the defendant resentenced to life imprisonment without the possibility of parole.

*Id.*, § 1, 2009 N.C. Sess. Laws at 1214. The General Assembly provided that the RJA "applies retroactively" and that for defendants sentenced to death prior to the RJA's effective date, "motions under this act shall be filed within one year of the effective date of this act." *Id.*, § 2, 2009 N.C. Sess. Laws at 1215.

Following hearings on 14 and 18 December 2009, the trial court denied defendant's motion for change of venue and defendant's motion to continue for RJA-related discovery. Defendant's trial began during the 10 May 2010 criminal session of Superior Court, Iredell County. On 11 May 2010, defendant made an oral motion to modify the courtroom arrangement objecting to the fact that when the parties arrived for trial, the first four rows directly behind the defense table were cordoned off by yellow crime scene tape. After the trial court denied his oral motion, defendant filed a written motion the following day alleging that this quarantining of the area behind the defense table effectively segregated the courtroom by race and forced defendant's family to sit in the back of the courtroom behind the crime scene tape while others, including white members of the victims' families, were able to sit in the front of the courtroom behind the prosecution table. The trial court ordered that the crime scene tape be removed but required that three rows behind the defense table remain vacant.

During jury selection, defendant twice objected to the prosecutor's use of peremptory challenges to exclude black jurors pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The trial court denied both of defendant's *Batson* challenges.

Defendant also renewed his motions to change venue and to continue for RJA-related discovery, noting that all twelve jurors selected to hear the case were white, and that all black potential jurors had been excused. The trial court denied these motions. On 28 May 2010, the jury returned verdicts finding defendant guilty of all charges. On 7 June 2010, following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended defendant be sentenced to death for each murder conviction. On 8 June 2010, the trial court sentenced defendant to death for each murder charge and to 61 to 83 months imprisonment for robbery with a dangerous weapon. Defendant gave notice of appeal to this Court.

Following his trial, on 10 August 2010, defendant filed a post-conviction motion for appropriate relief (MAR) under the RJA in both the trial court and in this Court. On 7 September 2010, this Court entered an order dismissing without prejudice defendant's MAR filed in this Court and staying further proceedings in defendant's direct appeal "until after the trial court's hearing and determination of defendant's Motion for Appropriate Relief Pursuant to the Racial Justice Act filed in Superior Court, Iredell County." *State v. Ramseur*, 364 N.C. 433, 702 S.E.2d 62 (2010).

On 21 June 2012, following a ruling in an RJA case in Cumberland County, *State v. Robinson*, No. 91 CRS 23143, Order Granting Motion for Appropriate Relief (Superior Court, Cumberland County, Apr. 20, 2012), *vacated by* 368 N.C. 596, 780 S.E.2d 151 (2015), and before the trial court ruled on defendant's pending RJA motion, the General Assembly passed a new law substantially amending the RJA (the

Amended RJA). An Act to Amend Death Penalty Procedures, S.L. 2012-136, §§ 1–10, 2012 N.C. Sess. Laws 471 [hereinafter Amended RJA] (repealed 2013). Under the Amended RJA, the trial court was not automatically required to hold an evidentiary hearing upon the filing of an RJA claim. *Compare* Original RJA, § 1, 2009 N.C. Sess. Laws at 1214 ("The court shall schedule a hearing on the claim and shall prescribe a time for the submission of evidence by both parties."), *with* Amended RJA, § 3, 2012 N.C. Sess. Laws at 472 (enacting N.C.G.S. § 15A-2011(f)(2) (Supp. 2012)) ("If the court finds that the defendant's motion fails to state a sufficient claim under this Article, then the court shall dismiss the claim without an evidentiary hearing."), *and* Amended RJA, § 3, 2012 N.C. Sess. Laws at 472 (enacting N.C.G.S. § 15A-2011(f)(3) (Supp. 2012)) ("If the court finds that the defendant's motion states a sufficient claim under this Article, the court shall schedule a hearing on the claim and may prescribe a time prior to the hearing for each party to present a forecast of its proposed evidence."). Additionally, the Amended RJA added a waiver provision as a prerequisite to filing an RJA claim, providing that:

> It shall be a condition for the filing and consideration of a motion under this Article that the defendant knowingly and voluntarily waives any objection to the imposition of a sentence to life imprisonment without parole based upon any common law, statutory law, or the federal or State constitutions that would otherwise require that the defendant be eligible for parole.

Amended RJA, § 3, 2012 N.C. Sess. Laws at 471.

Moreover, the Amended RJA altered what is necessary to establish racial discrimination by, *inter alia*: limiting the geographic regions solely to the "county or prosecutorial district" (eliminating "judicial division" and "State"); defining the relevant time period as "the period from 10 years prior to the commission of the offense to the date that is two years after the imposition of the death sentence"; and mandating that "[s]tatistical evidence alone is insufficient to establish that race was a significant factor under this Article." *Id.*, § 3, 2012 N.C. Sess. Laws at 472–73; *see also id.*, § 4, 2012 N.C. Sess. Laws at 473 (repealing N.C.G.S. § 15A-2012 (2009)). The Amended RJA also repealed N.C.G.S. § 15A-2011(b) (2009) (as set forth above) and provided instead, in relevant part:

> Evidence relevant to establish a finding that race was a significant factor in decisions to seek or impose the sentence of death in the county or prosecutorial district at the time the death sentence was sought or imposed may include statistical evidence derived from the county or prosecutorial district where the defendant was sentenced to death, or other evidence, that either (i) the race of the defendant was a significant factor or (ii) race was a significant factor in decisions to exercise peremptory challenges during jury selection.

*Id.*, § 3, 2012 N.C. Sess. Laws at 472. The General Assembly provided that the Amended RJA applies retroactively to any motions filed or hearings commenced under the Original RJA and that a defendant who filed an MAR under the RJA "shall have 60 days from the effective date of this act to amend or otherwise modify the motion." *Id.*, § 6, 2012 N.C. Sess. Laws at 473.

On 31 August 2012, defendant filed an amendment to his MAR filed under the Original RJA, asserting that he was entitled to pursue claims under both the Original RJA and the Amended RJA. On 29 November 2012, the State filed a response to defendant's RJA motions and requested judgment on the pleadings.

On 13 June 2013, still prior to any ruling by the trial court on defendant's pending RJA and Amended RJA motions, the General Assembly repealed the RJA in its entirety (the RJA Repeal). Act of June 13, 2013, S.L. 2013-154, § 5.(a), 2013 N.C. Sess. Laws 368, 372 [hereinafter RJA Repeal]. The General Assembly provided that the RJA Repeal "is retroactive and applies to any" MAR filed pursuant to the RJA "prior to the effective date of this act," and that all such motions "are void." *Id.*, 5.(d), 2013 N.C. Sess. Laws at 372. In light of the RJA Repeal, the State filed a second response on 23 August 2013 requesting that defendant's RJA claims be dismissed on the basis of the repeal. Defendant filed a response asserting that retroactive application of the RJA Repeal would be unconstitutional and that ruling on the State's motion would be premature.

In an order entered on 3 June 2014, the trial court dismissed defendant's RJA and Amended RJA claims. Citing only the statute and with no further explanation, the trial court stated that the only exception to the retroactive application of the RJA Repeal is in cases in which a final order has been entered. Because the trial court had not entered any final order in defendant's case, the trial court ruled that the RJA Repeal rendered all of his RJA and Amended RJA claims void. In addition, the trial

court made an alternative ruling summarily stating, without further elaboration or examination of the evidence or the parties' legal arguments, that "[i]n the alternative, this Court can determine that defendant's RJA and Amended RJA claims are without merit. An evidentiary hearing is not necessary to decide the issues raised in these claims, and these claims are all denied on the pleadings." The trial court also denied defendant's request for additional discovery.

On 9 April 2015, defendant filed a petition for writ of certiorari seeking review of the trial court's order and a "Motion to Maintain Stay of Direct Appeal." This Court allowed defendant's petition for writ of certiorari and his motion to maintain the stay of his direct appeal.

Standard of Review

At issue here is the constitutionality of the retroactive application of the RJA Repeal. "We review constitutional issues de novo." *State v. Whittington*, 367 N.C. 186, 190, 753 S.E.2d 320, 323 (2014) (citing *State v. Ortiz-Zape*, 367 N.C. 1, 10, 743 S.E.2d 156, 162 (2013), *cert. denied*, 572 U.S. 1134 (2014)).

*Ex Post Facto* Analysis of the RJA Repeal

Defendant argues that the retroactive application of the RJA Repeal violates the prohibition against *ex post facto* laws under the United States and North Carolina Constitutions.[1] Following relevant precedents of this Court indistinguishable from

---

[1] Defendant also challenges the constitutionality of the retroactive application of the RJA Repeal on other grounds, arguing that it: violates his rights under the Due Process and Law of the Land Clauses of the Federal and State Constitutions; violates the Constitutional

the facts of this case, we hold that the RJA Repeal is an unconstitutional *ex post facto* law when applied retroactively.

As an initial matter, it is well established that "a statute is presumed to have prospective effect only and should not be construed to have a retroactive application unless such an intent is clearly expressed or arises by necessary implication from the terms of the legislation." *State v. Green*, 350 N.C. 400, 404, 514 S.E.2d 724, 727 (1999) (citing *In re Mitchell*, 285 N.C. 77, 203 S.E.2d 48 (1974)); *see also Gardner v. Gardner*, 300 N.C. 715, 718, 268 S.E.2d 468, 471 (1980) (explaining that "a statute is deemed 'retroactive' or 'retrospective' when its operative effect is to alter the legal consequences of conduct or transactions completed prior to its enactment"). Here, in light of the plain language of the RJA Repeal, *see* RJA Repeal, § 5.(d), 2013 N.C. Sess. Laws at 372 ("[T]his section is retroactive and applies to any motion for appropriate relief filed . . . prior to the effective date of this act. All motions filed . . . prior to the effective date of this act are void."), it is clear that the General Assembly intended for

prohibition against Bills of Attainder under the Federal Constitution; violates his right to equal protection of the law under the Federal and State Constitutions; violates the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments to the Federal Constitution and Article I, Section 26 of the North Carolina Constitution; violates the guarantee of separation of powers under Article I, Section 6 and Article IV, Section 1 of the State Constitution; and deprives him of a vested right under the State Constitution. In addition to challenging the retroactive application of the RJA Repeal, defendants in the RJA cases before this Court also contend that the RJA Repeal was enacted with discriminatory intent and therefore is invalid under the Equal Protection Clauses of the Federal and State Constitutions. In light of our holding, we do not reach these other arguments. This opinion does not address in any way the prospective application of either the Amended RJA or the RJA Repeal.

the RJA Repeal to have a retroactive application. Thus, the sole question is whether the retroactive application of the RJA Repeal violates the prohibition against *ex post facto* laws.

Both our state and federal constitutions prohibit the enactment of *ex post facto* laws. U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the obligation of contracts . . . ."); N.C. Const. art. I, § 16 ("Retrospective laws, punishing acts committed before the existence of such laws and by them only declared criminal, are oppressive, unjust, and incompatible with liberty, and therefore no ex post facto law shall be enacted."); *see also State v. Wiley*, 355 N.C. 592, 625, 565 S.E.2d 22, 45 (2002) (stating that "both the federal and state constitutional *ex post facto* provisions are evaluated under the same definition"). The purpose of this prohibition against *ex post facto* laws is to "restrict[ ] governmental power by restraining arbitrary and potentially vindictive legislation" and to "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (citations omitted). Moreover, "[t]here is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." *Carmell v. Texas*, 529 U.S. 513, 533 (2000).

The United States Supreme Court has explained that there are four categories, first enumerated in 1798 by Justice Chase in *Calder v. Bull*, to which the prohibition against *ex post facto* laws applies:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (emphasis omitted) (quoting *Calder v. Bull*, 3 U.S. 386, 390–91 (1798) (opinion of Chase, J.)). The Court has also defined an *ex post facto* law as one "which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio*, 269 U.S. 167, 169 (1925); *see also Collins*, 497 U.S. at 50 (stating that the term "defense," as used in *Beazell*, "was linked to the prohibition on alterations in 'the legal definition of the offense' or 'the nature or amount of the punishment imposed for its commission'" (quoting *Beazell*, 269 U.S. at 169–70)).

At issue here is the third category of *ex post facto* laws, which includes not only those laws that increase the maximum sentence attached to a crime, but also any law

that makes the range or measure of punishments more severe. [2]  *See, e.g.*, *Peugh v. United States*, 569 U.S. 530, 539 (2013) (stating that the Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the *Ex Post Facto* Clause" (citing *Lindsey v. Washington*, 301 U.S. 397 (1937))); *California Dep't of Corr. v. Morales*, 514 U.S. 499, 505 (1995) ("[T]he Ex Post Facto Clause forbids the States to enhance the *measure of punishment* by altering the substantive 'formula' used to calculate the applicable sentencing range." (emphasis added)).  The Supreme Court has explained that "the ex post facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed" and that "an increase in the possible penalty is ex post facto, regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier."  *Lindsey*, 301 U.S. 397, 401 (citations omitted).  Accordingly, in order to establish that a challenged law impermissibly falls into this third category, a defendant "need not carry the burden of showing that he would have been sentenced to a lesser term under the measure or range of punishments in place under the previous statutory scheme," but he must "establish[ ] that the measure of punishment

---

[2] Defendant also argues that the RJA Repeal implicates the fourth category of *ex post facto* laws identified in *Calder* because it changed the quantum and type of evidence sufficient to sustain his death sentences.  It is not necessary to reach that additional question with regard to the RJA Repeal given our analysis below but the fourth category of *ex post facto* laws is relevant to the issue whether the Amended RJA can be applied retroactively.

itself has changed." *Morales*, 514 U.S. at 510 n.6 (1995) (citing *Lindsey*, 301 U.S. at 401).

Here the State first contends that defendant cannot establish any change in the measure of punishment attached to his criminal offenses because the Original RJA was enacted *after* defendant's crimes, and therefore the RJA Repeal had no effect on the punishment "applicable at the time of the crimes committed." The General Assembly, however, by giving the RJA retroactive effect, has declared that the RJA was the applicable law at the time the crimes were committed. The State does not challenge the constitutionality of the retroactive application of the RJA here, and we note that the *Ex Post Facto* Clause does not prohibit the retroactive application of laws that—like the RJA—are ameliorative in nature. *See Dobbert v. Florida*, 432 U.S. 282, 294 (1977) ("It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law."). This unusual situation is illustrated by this Court's decision in *State v. Keith*, 63 N.C. 140 (1869).

There the defendant, who had been indicted for murder stemming from events that occurred when he was serving as a Confederate officer in the Civil War, sought to avail himself of an "Amnesty Act" passed by the General Assembly following the conclusion of the war. *Id.* at 141–42. This Act provided a "full and complete amnesty, pardon and discharge" for all "homicides, felonies or misdemeanors" committed by officers and soldiers of both the United States and the Confederacy, provided that such acts were "done in the discharge of any duties imposed on him, purporting to be

by a law . . . . or by virtue of any order emanating from any officer, commissioned or non-commissioned." Act of Dec. 22, 1866, ch. 3, § 1, 1866-67 N.C. Sess. Laws 6, 6–7. By the time the defendant was brought to trial, however, the Constitutional Convention of 1868 had enacted "An Ordinance in Relation to the Pardon of Officers and Soldiers of the Late Confederate Service" repealing the Amnesty Act. Act of March 13, 1868, ch. 29, § 1, 1868 N.C. Ordinances and Resolutions of the Constitutional Convention 69, 69; *see also Keith*, 63 N.C. at 144 (stating that the "Convention of 1868 . . . was assembled under the Reconstruction Acts of Congress to form a new Constitution for the State, and as representing the people of North Carolina, it had general legislative powers"). The trial court "refus[ed] to discharge the prisoner entirely upon the effect of the ordinance of 1868," and the defendant appealed. *Keith*, 63 N.C. at 143.

On appeal, the Court considered whether the ordinance of 1868 violated the prohibition against *ex post facto* laws. *Id.* at 143–45. The Court noted that the "effects of a pardon are well settled in law: as far as the State is concerned, they destroy and entirely efface the previous offence; it is as if it had never been committed." *Id.* at 143; *see also id.* at 144 ("Bishop says it is 'a remission of guilt,' not only of the punishment of guilt." (citing 1 Bishop Cr. L. § 749)). Accordingly, the Court concluded that the ordinance of 1868, which had the intended effect of "reviv[ing] the previous

offences of the prisoner," "was substantially an *ex post facto* law" because "it made criminal what, before the ratification of the ordinance was not so."[3]  *Id.* at 144–45.

Here, as in *Keith*, the legislature passed a law aiming to repeal a prior, ameliorative law that had retroactively changed the law applicable to crimes already committed.  While the repeal in *Keith* involved the first *Calder* category, *see Calder*, 3 U.S. at 390 ("1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action."), the RJA Repeal falls under the third category inasmuch as it alters only the punishment and not the underlying crime.  However, the *Ex Post Facto* Clause's prohibition against retroactive legislation applies with equal force to each category.  *See, e.g.*, *Collins*, 497 U.S. at 46 (stating that "the constitutional prohibition is addressed to laws, 'whatever their form,' which make innocent acts criminal, alter the nature of the offense, or increase the punishment" and that "the prohibition which may not be evaded is the one defined by the *Calder* categories" (quoting *Beazell*, 269 U.S. at 170)).  The General Assembly, having decided with the enactment of the RJA to "alter the legal consequences of conduct . . . completed prior to its enactment," *Gardner*, 300

---

[3] The Court also concluded that the ordinance of 1868 unconstitutionally deprived the defendant of a vested right under the Law of the Land Clause of the North Carolina Constitution.  *Keith*, 63 N.C. at 144–45.  As noted above, defendant has also raised this issue in support of his position, but we decline to reach this argument and limit our analysis solely to the *Ex Post Facto* Clause.  *See, e.g.*, *Weaver*, 450 U.S. at 30 n.13 ("When a court engages in *ex post facto* analysis, which is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred, it is irrelevant whether the statutory change touches any vested rights.").

N.C. at 718, and to extend a new form of relief from the maximum punishment for first degree murder, cannot now "revive" the former measure of punishment attached to crimes already committed and make more burdensome "what, before the ratification of" the RJA Repeal, was less severe.[4] *Keith*, 63 N.C. at 144–45.

Nonetheless, the State contends that *Keith* is inapposite due to the unique nature and greater breadth of the Amnesty Act in comparison to the RJA. Specifically, the State asserts that the conditional, "potential" nature of the relief provided by the RJA renders it distinguishable from the "firmly established" immunity afforded by the Amnesty Act, which the State describes as a "blanket pardon" or "blanket amnesty." The State notes that the Court in *Keith* compared the Amnesty Act to "a general pardon by parliament," which need not be formally pleaded and cannot be waived. *Id.* at 142. According to the State, "the Amnesty Act did not grant conditional relief, it gave a full immunity to all Confederate and Union soldiers for acts done during the Civil War," whereas the RJA is merely a procedure that does "not provide 'amnesty' from the death penalty."

---

[4] While generally "both the federal and state constitutional *ex post facto* provisions are evaluated under the same definition," *Wiley*, 355 N.C. at 625, 565 S.E.2d at 45, the United States Supreme Court, unlike this Court, has not addressed a situation in which the legislature passes a law aiming to repeal a prior, ameliorative law that had retroactively changed the law applicable to crimes already committed. To the extent that the Supreme Court would reach a different conclusion when analyzing the United States Constitution, we are bound under our State Constitution's *Ex Post Facto* Clause by *Keith*.

Yet, this characterization of the Amnesty Act is inaccurate as the Amnesty Act limited its potential relief to acts committed in the "discharge of duties imposed" and required an indicted defendant to "show that he was an officer or private in either" the United States or the Confederacy, at which point "it shall be presumed that he acted under orders, until the contrary shall be made to appear." Act of Dec. 22, 1866, ch. 3, §§ 1-2, 1866-67 N.C. Sess. Laws 6, 6-7; *see also Keith*, 63 N.C. at 143 ("All that could have been necessary for the prisoner to do in this case, was to show that he was an officer or soldier, and that the felony was committed in the discharge of his duties as such, and we are clearly of opinion that this was sufficiently alleged; indeed no objection of that kind was taken below, and it may, therefore, admit of some doubt, whether it could properly be taken here."). The State concedes that, following a defendant's successful showing that he was an officer or private in the United States or the Confederacy, the resulting presumption was not irrebuttable. For instance, in *State v. Cook*, in addressing whether the defendant, a Confederate soldier, was entitled to relief under the Amnesty Act, the Court stated:

> The defendant craves the benefit of that act. But it cannot be allowed him; because it does not appear that his offence had any connection with his war duties. . . . It was not the intention of the act to exempt persons from punishment merely because they were soldiers; but only for acts which they committed *as* soldiers.

*State v. Cook*, 61 N.C. 535, 536–37 (1868). Thus, even with the Amnesty Act's more broadly aimed remedy, its conditional relief contemplated that certain procedural and

evidentiary steps may be required before a defendant did or did not receive the benefit of the Act.

More importantly, however, in stressing the nature of the Amnesty Act as a "blanket pardon" or "general pardon by parliament," the State does not identify anything about this characterization, apart from placing the Amnesty Act's repeal in a different *Calder* category, that changes the retroactivity analysis for the purposes of the *Ex Post Facto* Clause. Indeed, in explaining why a parliamentary pardon need not be formally pleaded, as opposed to a traditional executive pardon, the Court in *Keith* stated that "[t]he reason why a Court must, *ex officio*, take notice of a pardon by act of parliament, is that it is considered as a public law; having the same effect on the case as if the general law punishing the offence had been repealed or amended." *Keith*, 63 N.C. at 143 (quoting *United States v. Wilson*, 32 U.S. 150, 163 (1833)). While there are procedural differences in line with the different aims of the respective laws, both the Amnesty Act and the RJA are public laws "repeal[ing] or amend[ing]" the substantive laws of crime and punishment with respect to crimes already committed.

Finally, in that latter respect, the State asserts that the Original RJA did not substantively change the rules of law governing the death penalty, and therefore the RJA Repeal did not impermissibly increase the measure of punishment. The State points out that a retroactive law is not rendered impermissibly *ex post facto* if it results in a mere disadvantage to a defendant, and that "changes in the procedures

by which a criminal case is adjudicated, as opposed to the changes in the substantive law of crimes," do not constitute *ex post facto* laws. *Collins*, 497 U.S. at 45; *see also Miller v. Florida*, 482 U.S. 423, 433 (1987) ("[E]ven if a law operates to the defendant's detriment, the *ex post facto* prohibition does not restrict 'legislative control of remedies and modes of procedure which do not affect matters of substance.' Hence, no *ex post facto* violation occurs if the change in the law is merely procedural and does 'not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt.' " (citations omitted)); *Morales*, 514 U.S. at 506 n.3 (stating that "the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable"). According to the State, the RJA, which did not change the statutory aggravating circumstances that made defendant eligible for the death penalty, is merely "a procedural opportunity to raise a statutory claim for relief based on alleged racial discrimination," the repeal of which left in place existing mechanisms "to allege racial discrimination in his case by other means." This contention by the State misapprehends the nature and scope of the RJA.

With the enactment of the RJA, the General Assembly declared that "[n]o person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race." Original RJA, § 1, 2009 N.C. Sess. Laws at 1214. In order to effectuate this mandate the General

Assembly expansively defined what is necessary to establish "that race was the basis of the decision to seek or impose a death sentence." *Id.*, § 1, 2009 N.C. Sess. Laws at 1214. Specifically, such "[a] finding . . . may be established if the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed."[5] *Id.*, § 1, 2009 N.C. Sess. Laws at 1214. Moreover, in setting forth the type of evidence sufficient to support such a finding, the General Assembly provided that a defendant could rely on, *inter alia*, "statistical evidence" tending to show that either "[d]eath sentences were sought or imposed significantly more frequently upon persons of one race than upon persons of another race," "[d]eath sentences were sought or imposed significantly more frequently as punishment for capital offenses against persons of one race than as punishment of capital offenses against persons of another race," or "[r]ace was a significant factor in decisions to exercise peremptory challenges during jury selection." *Id.*, § 1, 2009 N.C. Sess. Laws at 1214.[6] This allowance of the use of statistical evidence must be seen as deliberate, as it comes after the Supreme Court's decision in *McCleskey v. Kemp*.

---

[5] Notably, while the RJA does not define the temporal parameters of the phrase "at the time the death sentence was sought or imposed," even in the substantially curtailed Amended RJA this timeframe was limited to the "period from 10 years prior to the commission of the offense to the date that is two years after the imposition of the death sentence." Amended RJA, § 3, 2012 N.C. Sess. Laws at 471.

[6] The RJA also eliminated any procedural bars that would apply to traditional motions for appropriate relief. Original RJA, § 1, 2009 N.C. Sess. Laws at 1215 ("Notwithstanding any other provision or time limitation contained in Article 89 of Chapter 15A of the General

There the Court rejected the petitioner's reliance solely on statistical evidence of racial disparities in capital sentencing in the context of claims brought under the Fourteenth and Eighth Amendments and indicated that the role of such evidence in litigating racial discrimination should be prescribed by state legislatures. *McCleskey v. Kemp*, 481 U.S. 279, 314–319 (1987) ("McCleskey's arguments are best presented to the legislative bodies. It is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes."). Following that suggestion, the General Assembly designed the RJA as a new substantive claim permitting the use of statistical evidence of racial disparities across different geographic areas and periods of time to establish racial discrimination in capital sentencing. Seth Kotch & Robert P. Mosteller, *The Racial Justice Act and the Long Struggle with Race and the Death Penalty in North Carolina*, 88 N.C. L. Rev. 2031, 2111–12 (2010) ("In enacting the [RJA], North Carolina determined that its inquiry would not be limited by *McCleskey v. Kemp* and its rejection of statistical evidence when examining constitutional claims[.] . . . The legislature understood that it was creating a different system of proof than that prescribed by *McCleskey*, explicitly accepting the Court's invitation to legislatures to act because they, rather than the

---

Statutes, a defendant may seek relief from the defendant's death sentence upon the ground that racial considerations played a significant part in the decision to seek or impose a death sentence by filing a motion seeking relief."); *see also* Seth Kotch & Robert P. Mosteller, *The Racial Justice Act and the Long Struggle with Race and the Death Penalty in North Carolina*, 88 N.C. L. Rev. 2031, 2114 n.370 (2010) ("[T]his provision allows defendants to litigate racial discrimination regarding peremptory strikes even if objections were not made at trial or might be subject to other procedural bars in Article 89.").

United States Supreme Court, are best able to judge how statistical studies should be used in regulating the death penalty." (footnotes omitted)).[7]   The General Assembly's decision to afford capital defendants this new, substantive basis for challenging the validity of a death sentence reflects ongoing concerns with the difficulty of proving covert racial discrimination,[8] particularly in capital sentencing

---

[7] As one state senator stated during the floor debate on the day the Senate first approved the RJA bill:

> Without this legislation, previous efforts to raise this issue would have been to no avail because of the *McCleskey* decision. . . . The *McCleskey* decision . . . said that while statistics may show race discrimination, it doesn't rise to the level of being a constitutional violation of the equal protection clause and specifically directed that if states wanted to provide this additional protection and making it a means by which somebody could prove race discrimination, then they could do it. And that's what we're doing here today.

Sen. Doug Berger, Senate Floor Debate on Racial Justice Act (May 14, 2009), https://archive.org/details/NorthCarolinaSenateAudioRecordings20090514/North_Carolina_ Senate_Audio_Recordings_20090514.mp3; *see also* Rep. Deborah Ross, House Floor Debate on Racial Justice Act (July 14, 2009), https://www.ncleg.gov/DocumentSites/House Documents/2009-2010%20Session/Audio%20Archives/2009/07-14-2009.mp3 ("In a 5-4 decision, the U.S. Supreme Court said that you don't have the constitutional right to present statistical evidence, though at the end of his opinion for the five judge majority, Justice Lewis Powell said 'these arguments are best presented to legislative bodies.' "); Barbara O' Brien & Catherine M. Grosso, *Confronting Race: How A Confluence of Social Movements Convinced North Carolina to Go Where the McCleskey Court Wouldn't*, 2011 Mich. St. L. Rev. 463 (2011).

[8] *See* Sen. Doug Berger, Senate Floor Debate on Racial Justice Act (May 14, 2009), https://archive.org/details/NorthCarolinaSenateAudioRecordings20090514/North_Carolina_ Senate_Audio_Recordings_20090514.mp3 ("I want to step back and explain, very quickly, where this idea of using statistics to prove race discrimination comes from and why it's needed.  Race discrimination is very hard to prove.  Rarely, particularly in today's time, do people just outright say, 'I am doing this because of the color of your skin.' Imagine if our Civil Rights Act that was passed in '64 said that the only way that you could prove race discrimination was by that sort of evidence—an admission by the person engaging in racial discrimination.  We would have had very little change in our society and culture in terms of

decisions, *see Turner v. Murray*, 476 U.S. 28, 35 (1986) ("Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected."), as well as the fact that the harm from racial discrimination in criminal cases is not limited to an individual defendant, but rather it undermines the integrity of our judicial system and extends to society as a whole, *Batson*, 476 U.S. at 87 ("Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. . . . The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community.").

---

the hiring practices."); Rep. Rick Glazier, House Floor Debate on Racial Justice Act (July 14, 2009), https://www.ncleg.gov/DocumentSites/HouseDocuments/2009-2010%20Session/Audio%20Archives/2009/07-14-2009.mp3 ("Well, I'm here to tell you, at least from my perspective, that unstated motivation is extraordinarily difficult to ferret out. That is why we use statistical evidence in employment discrimination cases, and if we are using statistical evidence in employment cases to protect property rights, I fail to see why credible statistical evidence ought not be a legislative reason or a legislative priority to allow people to use to fight for their life."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation. . . . In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." (alteration in original) (quoting *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir. 1971))); *see generally Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (stating that while the "Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection violates the Equal Protection Clause," "[t]he rub has been the practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad legitimate influences" (citations omitted)).

As this Court, in addressing Article I, Section 26 of our State Constitution ("No person shall be excluded from jury service on account of sex, race, color, religion, or national origin."), stated:

> Article I, section 26 does more than protect individuals from unequal treatment. The people of North Carolina have declared in this provision that they will not tolerate the corruption of their juries by racism, sexism and similar forms of irrational prejudice. They have recognized that the judicial system of a democratic society must operate evenhandedly if it is to command the respect and support of those subject to its jurisdiction. It must also be *perceived* to operate evenhandedly. Racial discrimination in the selection of grand and petit jurors deprives both an aggrieved defendant and other members of his race of the perception that he has received equal treatment at the bar of justice. Such discrimination thereby undermines the judicial process.
>
> Exclusion of a racial group from jury service, moreover, entangles the courts in a web of prejudice and stigmatization. To single out blacks and deny them the opportunity to participate as jurors in the administration of justice—even though they are fully qualified—is to put the courts' imprimatur on attitudes that historically have prevented blacks from enjoying equal protection of the law.

*State v. Cofield*, 320 N.C. 297, 302–03, 357 S.E.2d 622, 625–26 (1987) (footnote omitted) (citation omitted); *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2242 (2019) ("By taking steps to eradicate racial discrimination from the jury selection process, *Batson* sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system."); *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015) ("Discrimination in the jury selection process undermines

our criminal justice system and poisons public confidence in the evenhanded administration of justice.); *Miller-El v. Dretke*, 545 U.S. 231, 237–38 (2005) ("Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury, but racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish state-sponsored group stereotypes rooted in, and reflective of, historical prejudice[.] Nor is the harm confined to minorities. When the government's choice of jurors is tainted with racial bias, that 'overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial. That is, the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality, and undermines public confidence in adjudication[.]" (cleaned up)); *Ballard v. United States*, 329 U.S. 187, 195 (1946) ("The systematic and intentional exclusion of women, like the exclusion of a racial group, or an economic or social class, deprives the jury system of the broad base it was designed by Congress to have in our democratic society. . . . The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." (citations omitted)).

As part of its decision to make this new type of claim available to capital defendants, the General Assembly specified that the RJA would provide a unique and limited remedy:

> If the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed, the court shall order that a death sentence not be sought, or that the death sentence imposed by the judgment shall be vacated and the defendant resentenced to life imprisonment without the possibility of parole.

Original RJA, § 1, 2009 N.C. Sess. Laws at 1214. Thus, in its efforts to combat racial discrimination in our state's application of the death penalty—the most serious and irrevocable of our state's criminal punishments—the General Assembly designed a new substantive claim that fundamentally changes what is necessary to prove racial discrimination and, in return, provides a limited grant of relief that is otherwise unavailable.[9] *See generally Turner*, 476 U.S. at 35 ("The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence."); *California v. Ramos*, 463 U.S. 992, 998–99 (1983) ("The Court . . . has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.").

Accordingly, the RJA Repeal is not a mere procedural alteration that may "produce[ ] some ambiguous sort of 'disadvantage.' " *Morales*, 514 U.S. at 506 n.3.

---

[9] As part of its contention that the RJA and its repeal amount merely to procedural changes in the law, the State catalogues at length the existing legal doctrines and mechanisms for addressing racial discrimination in the criminal justice system. None of these protections, however, are as robust as the substantive guarantees provided by the RJA to these defendants. Indeed, the unique and otherwise unavailable protection afforded by the RJA was the reason for its enactment and, presumably, for its subsequent repeal.

Rather, by retroactively eliminating the RJA's substantive claim and its accompanying relief, the RJA Repeal increases the severity of the standard of punishment attached to the crime of first-degree murder and deprives defendant of a defense to the "nature or amount of the punishment imposed for its commission." *Collins*, 497 U.S. at 50 (quoting *Beazell*, 269 U.S. at 169–70). As such, the retroactive application of the RJA Repeal to defendant violates the prohibition against *ex post facto* laws.

It is within the purview of the General Assembly to pass such ameliorative laws granting potential relief from crimes and punishment to defendants for crimes already committed, and, having done so, it cannot then withdraw that relief consistent with the *Ex Post Facto* Clause, which "restricts governmental power by restraining arbitrary and potentially vindictive legislation," *Weaver*, 450 U.S. at 28–29, and serves "a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life," *Carmell*, 529 U.S. at 533. This interest in restricting "arbitrary and potentially vindictive legislation" is particularly relevant here,[10] given that the Amended RJA

---

[10] Here the *Ex Post Facto* Clause's interest in providing notice and fair warning is lessened, as the measure of punishment to which the RJA repeal subjected defendant was the same pre-RJA measure of punishment of which he had notice at the time he committed his crimes. But this was equally true in *Keith*, where the ordinance of 1868 returned the law to that which existed at the time the defendant allegedly committed his crimes, at which time he would have been deemed to have had notice not only of the potential legal consequences of participating in armed secession, but also of the consequences of homicides that

and the RJA Repeal followed closely on the heels of the four Cumberland County cases, in which the trial court concluded that the RJA evidentiary hearings uncovered significant evidence of widespread racial discrimination and disparities in our state's capital sentencing scheme and in which four convicted murderers had their sentences commuted to life imprisonment without parole by that court.

The dissent gives no weight to this fundamental fairness interest, which is apart from the concept of notice that is embodied in the constitutional prohibition on *ex post facto* laws. Instead, the dissent is premised on the narrow proposition that the only interest served by the *Ex Post Facto* Clause is to deter crime by providing "actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression." (quoting *Garner v. Jones*, 529 U.S. 244, 253 (2000)). However, the U.S. Supreme Court has acknowledged repeatedly, and did again in *Garner,* that preventing arbitrary and potentially vindictive legislation is also a purpose of the *Ex Post Facto* Clause. *Weaver*, 450 U.S. at 28–29. In *Garner*, the Court observed that "[t]he danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has stated that the *Ex Post Facto* Clause guards against such abuse." *Id.* at 253 (citing *Miller*, 482 U.S. at 429).

transcended the acceptable norms of war. Indeed, following the defendant's alleged role in the "Shelton Laurel Massacre," including the summary execution of thirteen captives, three of them aged 13, 14, and 17, the Confederate Governor of North Carolina, Zebulon B. Vance, had vowed to "follow him [Keith] to the gates of hell, or hang him." Phillip Shaw Paludan, *Victims: A True Story of the Civil War* 107 (1981).

The dissent reads the *ex post facto* prohibition too narrowly when concluding that it does not apply to the repeal of the RJA.

Our decision is further premised on the North Carolina Constitution, which this Court previously found to prohibit laws that seek to retroactively impose a greater penalty. Referring to the North Carolina Constitution, we explained:

> These great principles are inseparable from American government and follow the American flag. No political assemblage under American law, however it may be summoned, or by whatever name it may be called, can rightfully violate them, nor can any Court sitting on American soil sanction their violation. . . . The ordinance in question was substantially an *ex post facto* law; it made criminal what, before the ratification of the ordinance was not so; and it took away from the prisoner his vested right to immunity.

*State v. Keith*, 63 N.C. at 144–45. Here the right is to challenge a sentence of death on the grounds that it was obtained in a proceeding tainted by racial discrimination, and, if successful, to receive a sentence of life without parole. Repealing the RJA took away that right, and the repeal cannot be applied retroactively consistent with this state's constitutional prohibition on *ex post facto* laws.

We note that our analysis under the *Ex Post Facto* Clauses of the U.S. and North Carolina Constitutions addresses a question purely of law and applies equally to anyone in the same circumstances as defendant—specifically, any capital defendant who filed a motion for appropriate relief under the Original RJA. With respect to this class of individuals, the RJA Repeal cannot, consistent with

-31-

constitutional guarantees, retroactively apply to void their pending RJA claims. We express no opinion on the ultimate merits of defendant's RJA claims, nor those of any other capital defendant, and leave those issues to the trial courts to adjudicate in the first instance.

## *Ex Post Facto* Analysis of the Amended RJA

Our holding that the RJA Repeal cannot constitutionally apply retroactively to pending RJA motions necessitates examining whether the trial court erred in its alternative ruling that defendant's RJA and Amended RJA claims were without merit and its denial of his claims without a hearing. In order to address that issue, however, we must first determine whether the retroactive application of the Amended RJA violates the prohibition against *ex post facto* laws under the United States and North Carolina Constitutions. Specifically, defendant argues that "[t]o the extent that the amended RJA took away categories of claims that were available under the original RJA or impaired Mr. Ramseur's ability to assert any of his RJA claims, the retroactive application of the amended RJA was unconstitutional for all the same reasons the retroactive application of the repeal bill was unconstitutional."

Like the RJA Repeal, the Amended RJA contains a provision explicitly stating that it should apply retroactively:

> Unless otherwise excepted, this act, including the hearing procedure, evidentiary burden, and the description of evidence that is relevant to a finding that race was a significant factor in seeking or imposing a death sentence, also applies to any postconviction motions for appropriate

> relief that were filed pursuant to S.L. 2009-464. This act also applies to any hearing that commenced prior to the effective date of this act.

Amended RJA, § 6, 2012 N.C. Sess. Laws at 473. The Amended RJA further specifies that a person who filed an RJA MAR would have sixty days from the effective date of the act, 2 July 2012, to file an amended motion. *Id.*, § 6, 2012 N.C. Sess. Laws at 473. On its face, the law was intended to apply retroactively and, because it allowed defendants to amend their RJA MARs, there was an acknowledgement that the new evidentiary standards created a substantive change in the law.

The changes implemented by the Amended RJA, as summarized above, are both procedural and substantive. Moreover, the law also contained a severability clause which states: "If any provision of this act or its application is held invalid, the invalidity does not affect other provisions or applications of this act that can be given effect without the invalid provisions or application, and to this end the provisions of this act are severable." *Id.*, § 9, 2012 N.C. Sess. Laws at 473. Therefore, it is necessary to evaluate each of the changes worked by the Amended RJA to determine whether they fall into any of the categories of an *ex post facto* law when applied retroactively.

The Amended RJA made several significant changes to the Racial Justice Act. First, the Amended RJA altered the hearing procedure by providing that the trial court was no longer automatically required to hold an evidentiary hearing upon the filing of an RJA claim. Rather, under the Amended RJA, the trial court need only

schedule a hearing if it "finds that the defendant's motion states a sufficient claim." *Id.*, § 3, 2012 N.C. Sess. Laws at 473.

Second, the Amended RJA substantially altered the evidentiary requirements for an RJA claim. Specifically, as previously discussed, the Amended RJA altered what is necessary to establish racial discrimination by, *inter alia*: limiting the geographic regions solely to the "county or prosecutorial district" (eliminating "judicial division" and "State"); defining the relevant time period as "the period from 10 years prior to the commission of the offense to the date that is two years after the imposition of the death sentence"; and mandating that "[s]tatistical evidence alone is insufficient to establish that race was a significant factor under this Article." *Id.*, § 3, 2012 N.C. Sess. Laws at 472–73 (amending N.C.G.S. § 15A-2011(c) (2009) and enacting N.C.G.S. § 15A-2011(d)–(g) (Supp. 2012)); *see also id.*, § 4, 2012 N.C. Sess. Laws at 473 (repealing N.C.G.S. § 15A-2012 (2009)). The Amended RJA also repealed N.C.G.S. § 15A-2011(b) (2009)[11] and provided instead, in relevant part:

---

[11] N.C.G.S. § 15A-2011(b) (2009) of the Original RJA provided:

> Evidence relevant to establish a finding that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed may include statistical evidence or other evidence, including, but not limited to, sworn testimony of attorneys, prosecutors, law enforcement officers, jurors, or other members of the criminal justice system or both, that, irrespective of statutory factors, one or more of the following applies:
>
> (1) Death sentences were sought or imposed significantly more frequently upon persons of one race than upon persons of

> Evidence relevant to establish a finding that race was a significant factor in decisions to seek or impose the sentence of death in the county or prosecutorial district at the time the death sentence was sought or imposed may include statistical evidence derived from the county or prosecutorial district where the defendant was sentenced to death, or other evidence, that either (i) the race of the defendant was a significant factor or (ii) race was a significant factor in decisions to exercise peremptory challenges during jury selection.

*Id.*, § 3, 2012 N.C. Sess. Laws at 472.

Third, the Amended RJA added a waiver provision providing that in order to assert an RJA claim, a defendant must knowingly and voluntarily waive any objection to the imposition of a sentence to life imprisonment without parole. *Id.*, § 3, 2012 N.C. Sess. Laws at 471.

We conclude that the first alteration, amending the hearing procedure, is merely a procedural change which, while possibly working some disadvantage to a defendant, does not implicate the prohibition against *ex post facto* laws. *See Morales*, 514 U.S. at 506 n.3. The second alterations amending the evidentiary requirements,

---

another race.

(2) Death sentences were sought or imposed significantly more frequently as punishment for capital offenses against persons of one race than as punishment of capital offenses against persons of another race.

(3) Race was a significant factor in decisions to exercise peremptory challenges during jury selection.

Original RJA, § 1, 2009 N.C. Sess. Laws at 1214.

however, do constitute changes in the criminal law that cannot be applied retroactively. These revisions fall within the fourth *Calder* category by altering the "legal rules of evidence" and require a different, more stringent, standard of proof in showing the racially discriminatory imposition of the death penalty. *See Collins*, 497 U.S. at 41 (quoting *Calder*, 3 U.S. at 390 (opinion of Chase, J.)).

The third alteration, adding the waiver provision, may only be an *ex post facto* law as applied to certain defendants. It creates a condition precedent to asserting an RJA defense which, like the RJA Repeal, changes the punishment for any defendant who, prior to the amendment, could assert an RJA defense *and* further object to a sentence of life imprisonment without parole. It is difficult to determine whether any defendant actually could fall into such a category. In any event, any potential issue with the retroactive application of this waiver provision is unrelated to the trial court's alternative ruling in this case that defendant's RJA claims were without merit. Accordingly, because we need not decide this issue in order to determine whether the trial court erred in its alternative ruling, we decline to address here whether the retroactive application of the Amended RJA's waiver provision violates the prohibition against *ex post facto* laws.

In summary, the evidentiary changes effected by the Amended RJA are an *ex post facto* law that cannot constitutionally be applied to defendants who had RJA MARs pending at the time of the Amended RJA. For those defendants, the original RJA evidentiary rules apply. However, the portion of the Amended RJA which grants

a trial judge discretion over whether to hold a hearing is a procedural change which can be applied retroactively to pending RJA MARs.

<u>Defendant's RJA Claims</u>

Next, defendant argues that the trial court erred in its alternative rulings that defendant's RJA and Amended RJA MARs were without merit and could be denied without conducting an evidentiary hearing and that defendant was not entitled to discovery with respect to his RJA claims. The evidentiary forecast produced by defendant with his motions requires reversal of the trial courts' alternative rulings.

Defendant's extensive RJA and Amended RJA MARs "state with particularity how the evidence supports a claim that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed." Original RJA, § 1, 2009 N.C. Sess. Laws at 1214. Specifically, in accordance with the requirements of the RJA, defendant forecast, *inter alia*, statistical and non-statistical evidence that, taken in the light most favorable to defendant, tends to show that race was a significant factor in the prosecution's use of peremptory challenges, in the prosecution's decision to proceed capitally, and in the actual imposition of death sentences, at the time defendant's sentence was impos with respect to all four of the relevant geographic areas.

Defendant also alleged how in his case: he was brought to trial against a backdrop of prejudicial pre-trial publicity and racial tensions in the community; the

four rows in the courtroom directly behind the defense table were cordoned off with yellow crime scene tape at the start of the trial, suggesting that defendant was a dangerous criminal and forcing his black family members to sit in the back of the courtroom; six individuals who were later selected to serve as jurors were in the courtroom and observed the police tape before it was taken down two days later; all twelve jurors selected to hear the case were white and the trial court allowed the prosecution to exercise peremptory challenges to excuse all potential black jurors not removed for cause; the trial court denied defendant's request for a change of venue; and the trial court did not allow defense counsel to question potential jurors about issues of racial bias nor question the jury about whether they heard media accounts of the case or racially biased comments in the community. Both defendant's RJA MAR and Amended RJA MAR plainly "state[ ] a sufficient claim" under the RJA, as required by the Amended RJA in order to trigger an evidentiary hearing. Thus, the trial court at a minimum erred as a threshold matter in not conducting an evidentiary hearing on defendant's claims. Additionally, defendant's MARs established that he was entitled to discovery under N.C.G.S. § 15A-1415(f) (2019), which provides for complete discovery of state files in capital post-conviction cases. Accordingly, the trial court erred in denying defendant's MARs on the pleadings.

## Conclusion

In sum, we conclude that the RJA Repeal and the provisions of the Amended RJA altering the evidentiary requirements for an RJA claim constitute impermissible

*ex post facto* laws and cannot be constitutionally applied retroactively to defendant's pending RJA claims.  Further, we conclude that the trial court erred in ruling that defendant's claims lacked merit and denying his RJA claims without a hearing.  We remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice NEWBY dissenting.

The narrow issue presented by this case is whether, as applied to defendant, legislation repealing the Racial Justice Act of 2009 (the RJA) constitutes an ex post facto law. The majority incorrectly answers this question in the affirmative. The repeal plainly does not qualify as an ex post facto law because it left defendant in precisely the same legal situation as the one he occupied on 16 December 2007, when, according to a jury, he murdered Jennifer Lee Vincek and Jeffrey Robert Peck. The repeal did not subject defendant to more serious or additional charges for past conduct, nor did it increase the punishment in effect on 16 December 2007. When properly viewed, the General Assembly intended the RJA to provide a procedural mechanism by which a defendant could collaterally attack a capital sentence. The General Assembly did not intend to make a substantive change to the death penalty sentencing law. As such, the General Assembly had the constitutional authority subsequently to amend it and repeal it.

Viewed more broadly, though, this case is about who should determine the future of the death penalty in North Carolina. Under our system of government, the obvious answer to this question is that ultimate authority over death penalty policy resides with the people of this State. It is for them to determine whether North Carolina will have a death penalty and to establish, within constitutional bounds, the circumstances in which that penalty may be imposed. Ordinarily, the people exercise this power indirectly through their elected representatives in the General Assembly.

The majority's interpretation of the RJA cedes significant portions of the people's authority over death penalty policy to the courts. In the majority's view, the law empowers a judge to vacate a defendant's death sentence based on statistical evidence that race had been a significant factor in *other* death penalty proceedings in the county, prosecutorial district, judicial division, *or the State as a whole*, regardless of the role of race in defendant's own capital proceeding. This interpretation could be viewed as granting policymaking power to the judiciary to effectively eliminate the death penalty in North Carolina. By invalidating the RJA repeal, the majority does more than merely misapply the constitutional prohibition on ex post facto laws. It also intrudes upon the right of the people, in the form of their elected representatives, to decide death penalty policy for this State. I respectfully dissent.

Defendant was indicted on 31 December 2007 for the 16 December 2007 murders of Jennifer Lee Vincek and Jeffrey Robert Peck during the commission of an armed robbery of the Broad Street Shell Station in Iredell County for approximately $90 to $100. At the time of the armed robbery, Ms. Vincek worked at the station as a cashier on third shift, and Mr. Peck was a customer. At trial the jury watched a security video from the store capturing the robbery and murders as they occurred. The video showed the first shot striking Ms. Vincek while she lay on the ground behind the counter in a fetal position. When Ms. Vincek attempted to crawl away on her hands and knees, she was shot again. The video showed that her hair "popped off her back." The medical examiner testified that Ms. Vincek suffered from three

gunshot wounds with the first two being fairly superficial, but the third and fatal gunshot striking her in the back. Mr. Peck died from a single gunshot wound to the chest.

A jury convicted defendant of two counts of first-degree murder and one count of armed robbery. In recommending the death penalty, the jury unanimously found the following statutory aggravating factors under N.C.G.S. § 15A-2000: "(1) the capital felony was committed while the defendant was in engaged in the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); (2) the capital felony was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); (3) the capital felony was part of a course of conduct in which the defendant engaged and which included the commission of the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11)." Consistent with the jury's recommendation, the trial court entered a death sentence for each murder and a sentence of 61 to 83 months to run consecutively for the armed robbery.

Defendant committed his crimes in 2007, before the original RJA was enacted in 2009. After the original RJA was enacted, defendant delayed his direct appeal, *State v. Ramseur*, 364 N.C. 433, 702 S.E.2d 62 (2010), and instead filed a post-conviction motion for appropriate relief (MAR) under the RJA. Defendant filed his first MAR seeking relief under the original RJA and later filed a MAR under the amended RJA. Before the trial court rendered judgment, the legislature repealed the statutory provisions upon which defendant's motions relied. Act of June 13, 2013, S.L.

2013-154, § 5.(a), 2013 N.C. Sess. Laws 368, 372 [hereinafter the RJA Repeal]. In an order dated 3 June 2014, the trial court recognized that Session Law 2013-154 repealed the RJA and that the statutory language of the repeal retroactively applied to void defendant's RJA motions.

The trial court concluded that, because no final order had been entered on defendant's RJA claims or his claims under the amended RJA, those claims were controlled by the repeal of the RJA, and his RJA claims were voided as a matter of law. The trial court concluded that the unconditional repeal of the RJA warranted the dismissal of defendant's RJA claims, citing *Spooners Creek Land Corp. v. Styron*, 276 N.C. 494, 496, 172 S.E.2d 54, 55 (1970), and *In re Incorporation of Indian Hills*, 280 N.C. 659, 663, 186 S.E.2d 909, 911 (1972).

I.

Our system of government is founded on a principle that all people are created equal, possessing equal rights. *The Declaration of Independence* para. 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."); *see also* N.C. Const. art. I, § 1 ("We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness."). It is

imperative that all are treated equally under the law in every case that comes before the courts, particularly in criminal trials when life and liberty are at stake. Our state and federal constitutions recognize this sacred responsibility and safeguard against invidious discrimination. *See, e.g.*, N.C. Const. art. I, § 19 (protecting life, liberty, and due process rights with the Law of the Land Clause); *id.* art. I, § 26 (prohibiting exclusion "from jury service on account of sex, race, color, religion, or national origin"); *see also Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986) (holding that the Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race and setting the factual threshold for a defendant to establish a prima facie case of purposeful discrimination in jury selection); *Oyler v. Boles*, 368 U.S. 448, 82 S. Ct. 501 (1962) (A defendant cannot be selected for prosecution based on race, religion, or other arbitrary classification.); *State v. Bowman*, 349 N.C. 459, 509 S.E.2d 428 (1998) (discussing the constitutional right to a jury of one's peers and the protections to prevent arbitrary exclusion from the jury pool); *State v. Mitchell*, 321 N.C. 650, 653, 365 S.E.2d 554, 556 (1988) (A jury foreman cannot be excluded based on race.).

"[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder." *Gregg v. Georgia*, 428 U.S. 153, 226, 96 S. Ct. 2909, 2949 (1976) (White, J., concurring). The imposition of the death penalty "has a long history of acceptance both in the United States and in England." *Id.* at 176, 96 S. Ct. at 2927

(Stewart, J., opinion expressing the judgment of the Court). In *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726 (1972), the Supreme Court of the United States held that imposing and carrying out the death penalty under statutes that provide no basis for determining whether the penalty was proportionate to the crime would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. "The most marked indication of society's endorsement of the death penalty for murder is the legislative response to *Furman*. The legislatures of at least 35 States have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person." *Gregg*, 428 U.S. at 179–80, 96 S. Ct. at 2928 (footnote omitted); *see McCleskey v. Kemp*, 481 U.S. 279, 302, 107 S. Ct. 1756, 1772–73 (1987) (reviewing and approving of new statutory measures to, *inter alia*, ensure individualized assessments for each defendant's punishment based on definite statutory criteria such as the finding and weighing of aggravating factors by a jury). The weightiest of criminal punishment certainly requires the necessary legal justification. *Gregg*, 428 U.S. at 189, 96 S. Ct. at 2932. The Court in *Gregg* reviewed the legislative backlash from *Furman* and concluded:

> Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.

*Id.* at 186–87, 96 S. Ct. at 2931 (recognizing that ascertaining contemporary standards for purposes of the death penalty's viability under the Eighth Amendment is best left to legislative judgment).

While there is " 'no perfect procedure,' " "our consistent rule has been that constitutional guarantees are met when 'the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible.' " *McCleskey*, 481 U.S. at 313, 107 S. Ct. at 1778 (alteration in original) (first quoting *Zant v. Stephens,* 462 U.S. 862, 884, 103 S. Ct. 2733, 2746 (1983); then quoting *Singer v. United States*, 380 U.S. 24, 35, 85 S. Ct. 783, 790 (1965)). These safeguards are "designed to minimize racial bias in the process" and protect "the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants," on a case-by-case basis. *Id.* at 313, 107 S. Ct. at 1778. Case-by-case assessments by the courts have narrowed the scope of when the death penalty can be imposed based on the specific facts and the particular defendant.[1]

---

[1] *See, e.g., Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005) (precluding the death penalty due to offender's age); *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002) (precluding the death penalty due to offender's mental retardation); *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595 (1986) (precluding the death penalty due to offender's mental insanity); *Batson*, 476 U.S. at 84, 106 S. Ct. at 1716 (curtailing improper consideration of the race of potential jurors); *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368 (1982) (requiring offender's intent to kill); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954 (1978) (allowing offender's individualized mitigating circumstances); *Coker v. Georgia*, 433 U.S. 584, 97 S. Ct. 2861 (1977) (reviewing the proportionality of the crime to the penalty); *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978 (1976) (requiring an individualized assessment of the

II.

In North Carolina, a prosecutor has discretion to pursue the death penalty given the facts of a case, *see* N.C.G.S. § 15A-2004 (2019), but that prosecutorial discretion is limited by the constitutional principles of equal protection and due process, *see Oyler*, 368 U.S. at 456, 82 S. Ct. at 506. Recognizing the gravity of capital punishment, the General Assembly has created by statute other significant safeguards for capitally tried defendants. A defendant in a capital trial is given two attorneys. N.C.G.S. § 7A-450(b1) (2019). A capitally tried defendant may move to transfer venue to avoid local prejudice against him and secure a fair and impartial trial. *Id.* § 15A-958. Following a guilty verdict of first-degree murder, in a separate trial phase the jury considers aggravating factors from a comprehensive list, *id.* § 15A-2000(e), presented pursuant to the Rules of Evidence, *see id.* § 8C-1 (2019), and weighs any mitigating factors in defendant's favor, *id.* § 15A-2000(f). The jury must find the existence of an aggravating factor beyond a reasonable doubt and that that factor outweighs any mitigating factors before recommending the death penalty. *Id.* § 15A-2000(c)(1)–(3). This Court automatically reviews cases where a death sentence is imposed, *id.* § 7A-27(a)(1), to ensure the defendant received a fair trial, free from

---

offender and circumstances with objective standards to guide the process for imposing a sentence of death).

prejudicial error, and that the death sentence was proportional to the facts of the defendant's individual case.

In addition to a direct appeal, the General Assembly by statute provides an avenue for post-conviction review and lists grounds for post-conviction relief. *See* N.C.G.S. § 15A-1411 through N.C.G.S. § 15A-1422. A defendant may collaterally attack his conviction and sentence through a MAR filed with the trial court, *id.* § 15A-1420(b1)(1), or directly with this Court, N.C. R. App. P. 21(f) (2019). A capitally tried defendant may file a MAR on the grounds listed in N.C.G.S. § 15A-1415(b). *See, e.g.*, N.C.G.S. § 15A-1415(b)(7) ("There has been a significant change in law, either substantive or procedural, applied in the proceedings leading to the defendant's conviction or sentence, and retroactive application of the changed legal standard is required."); *id.* § 15A-1415(b)(8) (The sentence imposed was "unauthorized at the time imposed . . . or is otherwise invalid as a matter of law.").

Any trial court decision on a MAR is subject to appellate review. *See State v. Stubbs*, 368 N.C. 40, 42–43, 770 S.E.2d 74, 76 (2015); *see also District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69, 129 S. Ct. 2308, 2320 (2009) ("Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided."). The capitally tried defendant may raise issues of racial discrimination on direct appeal and through post-conviction MARs. *See* N.C.G.S. § 15A-2000(d)(2) (On appeal a death

sentence may be overturned, *inter alia*, "upon a finding that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.").

The RJA was signed into law on 11 August 2009. North Carolina Racial Justice Act, S.L. 2009-464, § 1, 2009 N.C. Sess. Laws 1213, 1214 [hereinafter original RJA] (codified at N.C.G.S. § 15A-2010 (2009)) (repealed 2013). This legislation, echoing our existing constitutional safeguards, provided that "[n]o person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race." *Id.*, § 1, 2009 N.C. Sess. Laws at 1214.

Under the RJA, a defendant who had been sentenced to death had the opportunity to file a post-conviction MAR using statistical or other evidence. It provides in part:

> (a) A finding that race was the basis of the decision to seek or impose a death sentence may be established if the court finds that race was a significant factor in decisions to seek or impose the sentence of death in the county, the prosecutorial district, the judicial division, or the State at the time the death sentence was sought or imposed.

*Id.* It allowed relief if a defendant proved that death sentences in the specified geographic areas were sought more frequently upon persons of one race or upon persons when victims were of another race, or when race was a "significant factor" in peremptory challenges during jury selection. *Id.* If the court found that the defendant had met his burden of proof then his death sentence was converted to a sentence of life without the possibility of parole. *Id.*

While the RJA became effective immediately and applied retroactively, *id.*, § 2, 2009 N.C. Sess. Laws at 1215, its retroactive application provided different relief and different filing requirements, depending on the status of a particular defendant's case. For those defendants who had previously been sentenced to death, the RJA required them to file a MAR within one year of the RJA's enactment. *Id.* The one-year requirement did not apply to those with pending cases. *See id.*, § 1, 2009 N.C. Sess. Laws at 1214. Though generally adhering to the requirements for filing MARs, the RJA also gave a specific mechanism in pending cases to those who claimed race was a significant factor in seeking the death penalty. *Id.* In those cases, defendants were allowed to raise their claims at the pretrial conferences. *Id.* If a defendant were successful in presenting the pretrial claim, then the State was prevented from seeking the death penalty in that case. *Id.*

In its original form, the RJA did not expressly address whether, in addition to producing statistical evidence that race had been a significant factor in other death penalty cases, a defendant had to show that race played a substantial role in the outcome of his own case. The majority interprets the RJA not to require such a showing. As explained in section V below, this erroneous interpretation of the RJA overlooks the RJA's stated purpose and raises serious separation-of-powers issues.

The General Assembly amended the RJA on 2 July 2012. An Act to Amend Death Penalty Procedures, S.L. 2012-136, §§ 1–10, 2012 N.C. Sess. Laws 471, 471

[hereinafter amended RJA]. The amending legislation made it clear that a defendant had to show particularized racial bias in his case to prevail:

> A finding that race was the basis of the decision to seek or impose a death sentence may be established if the court finds that race was a significant factor in decisions to seek or impose the death penalty *in the defendant's case* "at the time the death sentence was sought or imposed."

*Id.*, § 3, 2012 N.C. Sess. Laws at 471 (emphasis added). The amendment limited the relevant time frame for any statistical evidence presented by defining "at the time the death sentence was sought or imposed" "as the period from 10 years prior to the commission of the offense to the date that is two years after the imposition of the death sentence." *Id.* The amendment also limited the geographic area of relevant statistical evidence to the county or prosecutorial district and made other procedural changes. *Id.* The trial court was authorized to dismiss claims it determined to be insufficient without a hearing. *Id.*, § 3, 2012 N.C. Sess. Laws at 471–72. The amendment applied retrospectively to any case that had not received a final order affirmed on appeal under the original RJA. *Id.*, § 8, 2012 N.C. Sess. Laws at 472. Though the amended statute provided no additional post-conviction statutory procedural remedies to defendants alleging discrimination, a defendant retained the same right to bring claims based on constitutional violations as he possessed before and during the tenure of the RJA.

On 19 June 2013, the RJA was repealed in its entirety. RJA Repeal, §§ 5.(a), 6, 2013 N.C. Sess. Laws at 372. The repeal legislation applies retroactively, though it

exempts any judgments granting relief under the RJA that were affirmed on appeal and became final orders before the repeal legislation's effective date. *Id.*, § 5.(d), 2013 N.C. Sess. Laws at 372. Furthermore, the repeal legislation expressly acknowledges the continued existence of other procedural mechanisms by which capitally sentenced defendants may seek relief from death sentences on the ground that racial discrimination played a significant role in their convictions or sentences:

> Upon repeal of Article 101 of Chapter 15A of the General Statutes, a capital defendant retains all of the rights which the State and federal constitutions provide to ensure that the prosecutors who selected a jury and who sought a capital conviction did not do so on the basis of race, that the jury that hears his or her case is impartial, and that the trial was free from prejudicial error of any kind. These rights are protected through multiple avenues of appeal, including direct appeal to the North Carolina Supreme Court, and discretionary review to the United States Supreme Court; a postconviction right to file a motion for appropriate relief at the trial court level where claims of racial discrimination may be heard; and again at the federal level through a petition of habeas corpus.

*Id.*, § 5.(b), 2013 N.C. Sess. Laws at 372. In short, in repealing the RJA, the General Assembly merely eliminated one procedural mechanism by which defendants sentenced to death could seek relief for alleged racial discrimination; it left intact other procedural mechanisms by which defendants could seek relief on the same basis.

On 18 December 2015, following the wholesale repeal of the RJA, this Court reviewed and ultimately vacated trial court orders dated 20 April 2012 and 13

December 2012 that had granted certain defendants relief under the RJA. *State v. Robinson*, 368 N.C. 596, 597, 780 S.E.2d 151, 152 (2015); *see also State v. Augustine, Golphin and Walters*, 368 N.C. 594, 780 S.E.2d 552 (2015). The cases were remanded to the trial court. *Robinson*, 368 N.C. at 597, 780 S.E.2d at 152; *Augustine*, 368 N.C. at 594, 780 S.E.2d at 552.[2]

In our orders, vacating the trial court's orders, we determined that the trial court should have allowed the State's motion to continue, citing section 15A-952(g)(2) that "requires a trial court ruling on a motion to continue in a criminal proceeding to consider whether a case is 'so unusual and so complex' that the movant needs more time to adequately prepare." *Robinson*, 368 N.C. at 596, 780 S.E.2d at 151 (quoting N.C.G.S. § 15A-952(g)(2) (2013)); *see id.* ("The breadth of respondent's study placed petitioner in the position of defending the peremptory challenges that the State of North Carolina had exercised in capital prosecutions over a twenty-year period. Petitioner had very limited time, however, between the delivery of respondent's study and the hearing date."). This Court "express[ed] no opinion on the merits of respondent's motion for appropriate relief," but vacated the trial court's order and remanded to the trial court to "address petitioner's constitutional and statutory

---

[2] The majority's analysis relies, in part, on some of the substance of these vacated trial court orders. A vacated order is treated as if the order were never entered. *See Alford v. Shaw*, 327 N.C. 526, 544 n.6, 398 S.E.2d 445, 455 n.6 (1990) (defining "vacate" as " '[t]o annul; to set aside; to cancel or rescind. To render an act void; as, to vacate an entry of record, or a judgment' " (citing *Black's Law Dictionary* 1388 (rev. 5th ed. 1979))).

challenges pertaining to the Act." *Id.* Thus, no defendant had received statutory relief under the original or amended RJA before its repeal because no trial court judgment granting relief had been affirmed upon appellate review; therefore, no one has an established or "vested" right in the RJA procedure.

There is no dispute that the General Assembly intended to repeal retroactively the RJA. The question presented is whether the repeal violated the constitutional prohibition against ex post facto laws. Generally, a law is considered ex post facto if it criminalizes conduct after it occurred or increases the penalty of a crime already committed. The majority claims the RJA is "[a] public law[ ] 'repeal[ing] or amend[ing]' the substantive laws of crime and punishment with respect to crimes already committed." (Third and fourth alterations in original.) However, neither the crime of first-degree murder nor its potential punishment has been altered by the RJA or its repeal. The General Assembly intended the RJA to provide a new procedure through which a capitally sentenced defendant could collaterally challenge a death sentence. Consequently, the General Assembly acted within the scope of its authority when it amended and later repealed the RJA. The General Assembly has the authority to pass legislation directed at pending litigation and has the authority to direct statutory post-conviction criminal procedures and remedies, including procedural measures that do not alter the substance of the underlying crime and its punishment.

III.

"The legislative power of the State shall be vested in the General Assembly." N.C. Const. art. II, § 1. As the agent of the people's sovereign power, *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895), the General Assembly has the presumptive power to act, *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989). "All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *Preston*, 325 N.C. at 448–49, 385 S.E.2d at 478 (citations omitted). "We review constitutional questions de novo. In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond reasonable doubt." *State ex. rel. McCrory v. Berger,* 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016) (citation omitted).[3]

"The principal goal of statutory construction is to accomplish the legislative intent." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citing *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998)). "The best indicia of that intent are the language of the statute[,] . . . the spirit of the act[,] and

---

[3] The majority ignores this historic presumption of constitutionality of laws enacted by the legislature.

what the act seeks to accomplish." *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs of Town of Nags Head*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citation omitted).

As the policymaking branch, one legislature generally cannot bind a future legislature. *See Kornegay v. City of Goldsboro*, 180 N.C. 441, 451, 105 S.E. 187, 192 (1920). Thus, the General Assembly has the authority to enact new statutes, to amend or repeal current statutes, and to enact statutes directed at pending claims. "The Legislature may alter a provision of law at any time before the rights of parties are settled." *Blue Ridge Interurban R. Co. v. Oates*, 164 N.C. 167, 171, 80 S.E. 398, 399 (1913). A mere expectation that a law or a favorable statutory provision will continue does not amount to a vested property right or prevent the General Assembly from revisiting its policy decisions. *Armstrong v. Armstrong*, 322 N.C. 396, 402, 368 S.E.2d 595, 598 (1988); *Pinkham v. Unborn Children of Jather Pinkham*, 227 N.C. 72, 79, 40 S.E.2d 690, 696 (1946). When statutes providing a particular remedy are unconditionally repealed, the remedy is gone, and "there can be no further proceedings under the remedy." *Spooners Creek Land Corp.*, 276 N.C. at 495–96, 172 S.E.2d at 55; *see also In re Incorporation of Indian Hills*, 280 N.C. at 663, 186 S.E.2d at 912.

Specifically, regarding criminal cases, "[r]emedies must always be under the control of the legislature," "and it may prescribe altogether different modes of procedure in its discretion" that do not "dispense with any of those substantial

protections" that the law at the time provided the accused. *Thompson v. State of Missouri*, 171 U.S. 380, 386, 18 S. Ct. 922, 924 (1898); *see also In re Kivett*, 309 N.C. 635, 672, 309 S.E.2d 442, 464 (1983) ("Procedural changes of the law in criminal cases are not violations of the ex post facto doctrine." (citing *Dobbert v. State of Florida*, 432 U.S. 282, 97 S. Ct. 2290 (1977)). "There is no vested right in procedure and statutes affecting procedural matters may be given retroactive effect or applied to pending litigation." *State v. Morehead*, 46 N.C. App. 39, 43, 264 S.E.2d 400, 402 (1980) (citing *Spencer v. Motor Co.*, 236 N.C. 239, 72 S.E.2d 598 (1952)). Even if a certain criminal procedure implicates a constitutional right, it does not transform it into a substantive provision. *See id.* at 42–43, 264 S.E.2d at 402 (allowing an amendment to the North Carolina Speedy Trial Act to apply to the defendant's pending case because, "[a]t that time, defendant had no vested or substantial rights under the statute" even though the Sixth Amendment protects the right to a speedy trial). Modes of procedure do not operate substantive changes, "leav[ing] untouched the nature of the crime and the amount or degree of proof essential to conviction," *Hopt v. People of the Territory of Utah*, 110 U.S. 574, 590, 4 S. Ct. 202, 210 (1884); their alteration cannot constitute an ex post facto violation.

## IV.

Since our earliest history, ex post facto laws have been prohibited. Ex post facto laws criminalize past actions or increase a punishment from what a defendant could

have received at the time of the crime's commission. Recognizing that one of the purposes of criminalizing conduct is deterrence,

> [a] law made after the fact (ex post facto) could not logically have deterred the crime; to punish a person for an act not contrary to the law when committed was therefore unjust. More than individual injustice was involved; the whole social basis of republican government was jeopardized if the people did not know exactly what was prohibited.

John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 63 (2d ed. 2013). The first constitution of North Carolina adopted in 1776 provided "[t]hat retrospective laws, punishing facts committed before the existence of such laws, and by them only declared criminal, are oppressive, unjust, and incompatible with liberty; wherefore no ex post facto law ought to be made." N.C. Const. of 1776, Declaration of Rights, § 24. Early in our nation's history, the Supreme Court of the United States discussed the idea of ex post facto laws in *Calder v. Bull*, 3 U.S. 386 (1798). Relying in part on the North Carolina Constitution's explicit prohibition on criminal ex post facto laws, the Supreme Court in *Calder* confined the definition of ex post facto laws to retrospective criminal laws that punish acts committed before they became crimes and laws that exact a more severe punishment than they would have incurred at the time they were committed. *The North Carolina State Constitution* 63–64.

As recently as 2010, "[t]his Court has articulated that 'both the federal and state constitutional ex post facto provisions are evaluated under the same definition.'" *State v. Whitaker*, 364 N.C. 404, 406, 700 S.E.2d 215, 217 (2010) (quoting

*State v. Wiley*, 355 N.C. 592, 625, 565 S.E.2d 22, 45 (2002), *cert. denied*, 537 U.S. 1117, 123 S. Ct. 882 (2003)). The term ex post facto generally should be limited to only those retroactive laws "that create, or aggravate, the crime; or [i]ncrease the punishment, or change the rules of evidence, for the purpose of conviction." *Calder*, 3 U.S. at 391 (opinion of Chase, J.). "[A]ny statute . . . which makes more burdensome the punishment for a crime, after its commission, . . . is prohibited as ex post facto," *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S. Ct. 68, 68 (1925), because "legislatures may not retroactively . . . increase the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S. Ct. 2715, 2719 (1990).

To be an ex post facto law, the legislative change must "alter[ ] the definition of criminal conduct or increase[ ] the penalty by which a crime is punishable." *California Dep't of Correction v. Morales*, 514 U.S. 499, 506 n.3, 115 S. Ct. 1597, 1602 n.3 (1995). "[M]ore burdensome" does not equate to "some ambiguous sort of 'disadvantage' " for defendant, *id.*; it relates to the quantum of punishment assigned to the offense at the time of its commission, *see, e.g.*, *State v. Bowditch*, 364 N.C. 335, 341, 700 S.E.2d 1, 5 (2010) ("An ex post facto law may be defined . . . as a law that 'allows imposition of a different or greater punishment than was permitted when the crime was committed.' " (quoting *State v. Barnes*, 345 N.C. 184, 233–34, 481 S.E.2d 44, 71 (1997))); *State v. Vance*, 328 N.C. 613, 620, 403 S.E.2d 495, 500 (1991), *cert. denied*, 522 U.S. 876, 118 S. Ct. 196 (1997); *State v. Wright*, 302 N.C. 122, 128, 273

S.E.2d 699, 704 (1981); *State v. Detter*, 298 N.C. 604, 637, 260 S.E.2d 567, 589–90 (1979).

Even if a legislative amendment creates a disadvantage, that circumstance "is an insufficient basis to establish an ex post facto violation unless the change in the law actually increased the quantum of punishment for the offense," *Hameen v. State of Delaware*, 212 F.3d 226, 245–46 (3rd Cir. 2000), in other words, the range of punishment assigned to the offense at the time of its commission.

The central concern of the Ex Post Facto Clause is "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Lynce v. Mathis*, 519 U.S. 433, 441, 117 S. Ct. 891, 895–96 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 30, 101 S. Ct. 960, 965 (1981)); *see also Dobbert*, 432 U.S. at 297, 97 S. Ct. at 2300 ("The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder."); *Garner v. Jones*, 529 U.S. 244, 253, 120 S. Ct. 1362, 1369 (2000) (The ex post facto doctrine carries "some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression . . . .").

The majority focuses its analysis of the original RJA on the third *Calder* category, which prohibits "[e]very law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed" as an ex

post facto law. *Calder*, 3 U.S. at 390 (opinion of Chase, J.). The majority concludes the RJA repeal fits into the third *Calder* category because it " 'revive[s]' the former measure of punishment attached to crimes already committed and make[s] more burdensome" the punishment that the original RJA made "less severe." According to the majority's rationale, the original RJA's retroactivity changed the quantum of punishment annexed to every capital conviction by offering the possible sentence of life without the possibility of parole. In its view, the RJA repeal then "revive[d]" the "more severe" punishment of death when it in actuality only altered a post-conviction procedure.

The majority wrongly concludes that the original RJA retroactively and substantively changed the quantum of punishment the law annexed to the crime of first-degree murder and that the RJA repeal increases its punishment. The punishment for first-degree murder before, during, and after the RJA has been the same and remains the same. The General Assembly intended the RJA to be a procedure to collaterally attack a capital sentence. By its nature, a collateral attack does not address the substance of the crime itself or its penalty.

The foundation of the majority's approach is that, "[t]he General Assembly, . . . by giving the RJA retroactive effect, has declared that the RJA was the applicable law at the time the crimes were committed." It makes this claim without analysis. However, it begs the question of whether the General Assembly, by using the term "retroactive," intended simply to give all those subject to the death penalty an

additional procedural tool to attack their sentences or, more expansively, to substantively change the punishment for first-degree murder. Courts should interpret statutes as the legislature intended. If the General Assembly had wanted to change the statutory punishment for first-degree murder to incorporate the provisions of the RJA, it could have done so; but, it chose not to change the statutory punishment. Likewise, the General Assembly could have specified that the provisions of the RJA are retroactive to the dates of each offense. Again, it did not do so. The General Assembly simply provided that the RJA's provisions were "retroactive." Certainly, whether the provisions of the RJA apply to a particular defendant is unknown at the time of the offense. They only apply if a defendant receives a death sentence.

The best reading of this provision in context of the entire RJA is that the General Assembly intended the RJA procedure to be available to all those who had been sentenced to death already or those facing capital trials who are ultimately sentenced to death. The text of the statute supports this interpretation. As previously discussed, the RJA provides for different remedies and filing requirements, depending on each defendant's status. The RJA is not a substantive change in the penalty for first-degree murder. This interpretation of the RJA is consistent with the position taken in a publication by the University of North Carolina School of Government, the institute tasked with educating legal practitioners and judges. *See* The Racial Justice Act, *N.C. Capital Case Law Handbook* ch. 7, at 273 (School of

Gov't, Chapel Hill, N.C., 3d ed. 2013) ("In analyzing the possible ex post facto constraints on the application of the amended RJA, it is helpful to divide capital defendants into three classes based on the date of the charged offense: Offense dates prior to August 11, 2009. These defendants allegedly committed murder prior to the enactment of the original RJA. The protections offered by the amended RJA, although less substantial than the protections offered by the original RJA, are no less than what was available to these defendants at the time of their alleged crimes. Therefore, there is no ex post facto problem for these defendants." (emphasis omitted)). No doubt, as considered by the author of this publication, ex post facto case law does not support the majority's analysis.

In *Dobbert v. State of Florida*, 432 U.S. 282, 97 S. Ct. 2290 (1977), a new statute in effect at the time of the petitioner's trial made the jury's recommendation of a life or death sentence advisory and not binding on a judge. *Id.* at 289–91, 97 S. Ct. at 2296–97. It altered the method used to determine whether a criminal defendant would receive the death penalty because the judge could still impose the death penalty against the jury's recommendation. *Id.* at 294–95, 97 S. Ct. at 2299. In the petitioner's case, "the trial judge, pursuant to his authority under the amended Florida statute, overruled the jury's recommendation and sentenced petitioner to death." *Id.* at 287, 97 S. Ct. at 2295. The petitioner argued, *inter alia*, that "the change in the role of the judge and jury in the imposition of the death sentence in Florida between the time of the first-degree murder and the time of the trial constitutes an

ex post facto violation." *Id.* at 292, 97 S. Ct. at 2297. The Supreme Court, however, described the change as "clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293–94, 97 S. Ct. at 2298.[4]

The Supreme Court considered the statutory change to be procedural, and not a matter of substance, even when the change occurred during the initial trial itself, when the sentence was first imposed. "[A] procedural change is not ex post facto," even if it works "to the disadvantage of a defendant." *Id.* at 293, 97 S. Ct. at 2298. Moreover, the petitioner could not show he was entitled to a lesser sentence; his argument amounted to mere speculation because "it certainly cannot be said with assurance that, had his trial been conducted under the old statute, the jury would have returned a verdict of life." *Id.* at 294, 97 S. Ct. at 2299.

---

[4] Retroactive, substantive rule changes interfere with the jury's fact-finding process by altering the burden of proof for the underlying offense or the quantum of punishment. *Compare State v. Correll*, 715 P.2d 721 (1986) (retroactively applying an aggravating circumstance that did not exist at the time the offense was committed, makes defendant guilty of a greater crime)*, with Hameen*, 212 F.3d at 244 (allowing a judge to impose the death penalty under a modified sentencing scheme when the jury had already unanimously found the aggravating factors outweighed the mitigating circumstances and classifying the modification as procedural); *accord Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002) (requiring a jury to adjudicate a defendant's guilt and the presence or absence of the aggravating factors to the death penalty for first-degree murder, in keeping with Sixth Amendment right to a jury trial in capital prosecutions).

In *California Department of Correction v. Morales*, 514 U.S. 499, 115 S. Ct. 1597 (1995), a California statute amended post-conviction parole procedures to allow the Board of Prison Terms to decrease the frequency of parole suitability hearings under certain circumstances. Respondent Morales broadly argued that "the Ex Post Facto Clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment." *Id.* at 508, 115 S. Ct. at 1602. The Court first determined that the legislation did not alter the definition of the crime, *id.* at 505, 115 S. Ct. at 1601, and further rejected respondent's expansive argument, holding instead that the amendment did not increase the "punishment" attached to respondent's crime of second-degree murder. *Id.* at 507–08, 115 S. Ct. at 1602. Even if it altered the method for fixing a parole release date, it did not change respondent's indeterminate sentence of fifteen years to life for the murder of his wife. *Id.* at 508–09, 115 S. Ct. at 1603. *Compare id.* (recognizing a "speculative and attenuated possibility" of parole for respondent who, while parole-eligible, had committed more than one murder, one while paroled for another offense)*, and Jones v. Keller*, 364 N.C. 249, 259, 698 S.E.2d 49, 57 (2010) (affirming the trial court in finding no ex post facto violation when the defendant "d[id] not allege that any legislation or regulation has altered the award of sentence reduction credits" or that there had been an administrative change in the interpretation of applicable regulations), *cert. denied*, 563 U.S. 960, 131 S. Ct. 2150 (2011)*, with Lynce*, 519 U.S. at 439–47, 117 S. Ct. at 895–99 (retroactively cancelling provisional early release credits awarded to a state prisoner to alleviate prison

overcrowding, thereby resulting in rearrest and reincarceration of that prisoner, violated Ex Post Facto Clause).

In *Hopt v. People of the Territory of Utah*, 110 U.S. 574, 4 S. Ct. 202 (1884), a change in the rules of evidence, occurring after the commission of the crime but before the defendant's retrial, enlarged the class of competent witnesses to testify in criminal trials to include convicted felons. *Id.* at 587–88, 4 S. Ct. at 209. The State presented a convicted felon as a new witness who testified against the defendant. *Id.* Despite the new law's effect of expanding the range of admissible evidence in the guilt or innocence phase, the Supreme Court of the United States held the change was not ex post facto because it "relate[d] to modes of procedure only in which no one can be said to have a vested right, and which the state, upon grounds of public policy, may regulate at pleasure." *Id.* at 590, 4 S. Ct. at 210. It did not meet the definition of an ex post facto law because the change did not alter the underlying crime, the burden of proof for proving its elements, or the punishment prescribed for it:

> [T]hey do not attach criminality to any act previously done, and which was innocent when done, nor aggravate any crime theretofore committed, nor provide a greater punishment therefor than was prescribed at the time of its commission, nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. *The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute.*

*Id.* at 589–90, 4 S. Ct. at 210 (emphasis added); *see also Thompson*, 171 U.S. at 386–87, 18 S. Ct. at 924–25 (finding no ex post facto violation in the seemingly pointed change in the law to allow admissibility of handwriting comparisons upon retrial because it "did not enlarge the punishment to which the accused was liable when his crime was committed" or change the quality of degree of proof required to prove the offense at the time of its commission).

Applying ex post facto jurisprudence, it is clear that both the original RJA and its amendment were procedural in nature. The original and amended RJA statutes provided a procedural tool for seeking post-conviction relief for claims of racial discrimination. Neither altered the elements of first-degree murder, the necessary proof for conviction, or its potential penalties. There has always been and remains the possibility of amelioration of a defendant's capital sentence on direct appeal, *see* N.C.G.S. § 15A-2000(d)(2), and through post-conviction relief, N.C.G.S. § 15A-1417. The repeal of the RJA left defendants in capital cases other means of raising claims of discrimination. As a procedural statute, it is not an ex post facto violation to amend the RJA or repeal it.[5]

---

[5] The interpretation of the Ex Post Facto Clause has included the concept of "vested rights" with the implication that an ex post facto law impairs a vested right. "The true construction and meaning of the prohibition is, that the states pass no law to deprive a citizen of *any right vested in him* by existing laws." *Calder*, 3 U.S. at 394 (opinion of Chase, J.) (emphasis added) (discussing a just application of retroactive rules, including pardons and a taking justly compensated). "Alterations which leav[e] untouched the nature of the crime and the amount or degree of proof essential to conviction . . . relate to modes of procedure only, in which no one can be said to have a *vested right*, and which the state, upon grounds of public

The majority heavily relies on *State v. Keith*, 63 N.C. 140 (1869), to support its classification of the RJA repeal as an ex post facto law; however, that case is inapposite.

In the aftermath of the Civil War, the General Assembly passed the Amnesty Act of 1866, which "contain[ed] a full and unequivocal pardon for all 'homicides and felonies' committed by officers or soldiers of the late Confederate States, or by officers or soldiers of the United States, 'done in the discharge of any duties imposed on him, purporting to be by a law of the State or late Confederate States Governor, or by virtue of any order emanating from any officer.' " *Id.* at 142 (quoting Act of Dec. 22, 1866, ch. 3 § 1, 1866-67 N.C. Sess. Laws 6, 6–7). The Act was later repealed by legislative action at the Constitutional Convention of 1868. *Id.* at 144. The central issue in *Keith* was whether the repeal of the Act was valid. *Id.*

The language of the Act expressly provided that, "if the defendant can show that he was an officer or a private in either of the above named organizations at the time, it shall be presumed that he acted under orders, until the contrary shall be made to appear." *Id.* at 142 (quoting Act of Dec. 22, 1866, ch. 3 § 2, 1866-67 N.C. Sess. Laws 6, 6–7). If he could show he was a soldier at the time, then it was presumed he was acting under orders for otherwise criminal acts and would be entitled to full

---

policy, may regulate at pleasure." *Hopt*, 110 U.S. at 590, 4 S. Ct. at 210 (emphasis added)); *see also Thompson*, 171 U.S. at 388, 18 S. Ct. at 925 ("We cannot adjudge that the accused had any *vested right* in the rule of evidence . . . ." (emphasis added)).

amnesty for those acts. *Id.* In *Keith* the defendant alleged, and the solicitor agreed, "that his case came within the provisions of that act." *Id.* Thus, Keith properly claimed the Act's benefit and, if the repeal of the Act did not affect the defendant's claim, he was undisputedly entitled to it.

To determine whether the legislature could repeal its grant of legislative amnesty, the Court defined this legislative act as "destroy[ing] and entirely effac[ing] the previous offen[s]e; it is as if it had never been committed." *Id.* at 143. Referencing English common law, the Court determined that, if the legislature issued a general legislative pardon, the Court was bound to take notice of it and "cannot proceed against any person whatsoever" who is entitled to the pardon "as to any of the offen[s]es pardoned" even if he neglects to raise it or waives it. *Id.* at 142. Simply put, the pardon remitted guilt entirely by treating the offense as if it had never occurred. *Id.* at 144.

Even if the soldier did nothing but belong to the historically unique class of Civil War soldiers on duty, he was entitled to relief under it. As a legislative pardon, the Act in effect removed a historically unique class of individuals from the reach of criminal laws, making it as if "the offen[s]e had been repealed or amended" to exclude that class of individuals. *Id.* (A legislative pardon "is considered as a public law; having the same effect on the case as if *the general law punishing the offen[s]e* had been repealed . . . ." (emphasis added) (quoting *United States v. Wilson*, 32 U.S. 150,

163 (1833))).[6] In making its determination, the Court in *Keith* analogized that the revocation of amnesty "was substantially an ex post facto law; it made criminal what, before the ratification of the ordinance was not so; and it took away from the prisoner his vested right to immunity." *Id.* at 145.

The majority relies on the reasoning in *Keith* to argue that the RJA repeal is an unconstitutional ex post facto law that affected defendant's substantive rights. The RJA repeal, however, does not fit the definition of ex post facto as discussed in *Keith*.

In *Keith* the General Assembly granted a blanket legislative pardon to all Civil War soldiers for their crimes, making what had been criminal no longer criminal; it were as if the criminal acts never happened. The Amnesty Act applied to all soldiers, presuming they were acting under orders. The enactment created a vested right to the pardon. The Amnesty Act became part of the substantive criminal trial. Courts were required to apply the legislative pardon even if not raised by the defendant. In

---

[6] Illustratively, in *State v. Blalock*, 61 N.C. 242, 244 (1867), defendants similarly situated to Keith had already been convicted of murder. On appeal the Court in *Blalock* took judicial notice of the Act, "and seeing from the record that the case of the prisoners came within it, ordered their discharge." *Keith*, 63 N.C. at 143 (citing *Blalock*, 61 N.C. at 247–48). The Court did not remand to the trial court to hold a hearing. On the contrary, the prisoners were automatically entitled to relief once the Court concluded that they fit squarely within the Act's purview. On the other hand, defendant Cook in *State v. Cook*, 61 N.C. 535 (1868), was not entitled to amnesty in the first place because his murder did not occur while he was "on duty." The purview of the Act only included acts done while performing wartime duties. The Act did not speak to the consequences for "off-duty" conduct.

short, soldiers did not have to follow any procedure to be entitled to its benefits. There was no deadline or expiration.

The RJA is clearly not analogous to legislative amnesty. The RJA did not grant amnesty or remit guilt; it is not a pardon. It is not a blanket change in the penalty for first-degree murder. This distinction between the RJA and legislative amnesty is underscored by the fact that the RJA provides a different procedure for defendants already convicted than for those with capital trials pending. Original RJA, § 2, 2009 N.C. Sess. Laws at 1215. It does not provide relief to all those with capital sentences, but rather any potential relief is conditioned on multiple factors. In order to pursue relief, each defendant must meet a filing deadline. RJA claims are not part of a defendant's trial, but must be pursued through a collateral motion for relief. Each defendant has the burden of proof and must provide sufficient evidence in support of the claim. Under the RJA, a defendant's relief becomes vested only upon a final order affirmed on appeal. Even if a defendant theoretically received RJA relief, that relief would not speak to his actual innocence or afford him the opportunity to retry his guilt or innocence through a new trial. Thus, the provisions of the RJA cannot be analogized to a legislative grant of immunity or "a full and unequivocal pardon." *Keith*, 63 N.C. at 142. The RJA simply provided a statutory avenue by which to pursue possible post-conviction relief.

Far from resembling the defendant's situation in *Keith*, defendant's position in this case is more akin to that of the petitioner in *United States ex rel. Forino v.*

*Garfinkel*, 166 F.2d 887 (3rd Cir. 1948), an Italian national who was serving a sentence for second-degree murder. At the time of the petitioner's offense and trial, state law "pardoned" certain offenders once they had served their sentences. *Id.* at 888–89. The legislature repealed the pardon law before the petitioner completed his sentence. *Id.* at 889. Without a pardon, the petitioner faced deportation. *Id.* at 888. In an effort to avoid that outcome, the petitioner argued that

> in effect that he ha[d] achieved the benefit of a legislative pardon, or at least should be deemed to have acquired the status of a person who has been pardoned by the Pennsylvania Legislature, since otherwise the repealing statute would be given retroactive effect and he would lose his civil right to a legislative pardon, a right which he says was acquired by him prior to the passage of the repealing statute.

*Id.* at 889. The petitioner further maintained that, to "treat the repealing statute as effective when he had served part of his sentence at the time it was enacted [would have been] to impose upon him the burden of [a constitutionally prohibited] ex post facto law." *Id.*

The United States Court of Appeals for the Third Circuit disagreed. "The flaw in Forino's reasoning lies in the fact that the access to legislative grace was withdrawn by an act of the Pennsylvania Legislature before he had endured his punishment." *Id.* at 889–90. The court noted that "[n]o one has or can acquire a vested right to a pardon," *id.* at 889, and that,

> [t]o sustain Forino's point one would have to take the position that any sentence of imprisonment imposed prior

> to the effective date of the repealing act carried with it a right to a legislative pardon. This would constitute judicial legislation and would change the terms of the Legislative Pardons Act making the issuance of the pardon dependent on the imposition of the sentence on the criminal and not on the criminal having endured his punishment.

*Id.* at 890. The court concluded that Forino, in making an ex post facto argument, "confuse[d] the nature of punishment and the nature of a pardon. He [took] the broad position that any law which alters his position to his disadvantage is necessarily ex post facto. . . . But the repeal of the Legislative Pardons Act did not change the punishment or inflict a greater punishment on Forino." *Id.* (citing *Calder*, 3 U.S. at 390–91). By the time Forino had served his sentence, "the grace previously afforded by the Legislative Pardons Act had been withdrawn." *Id.*

In other words, the Pennsylvania legislature's repeal of the pardon statute in *Forino* did not amount to an ex post facto law in the petitioner's case because the petitioner never obtained a pardon under the statute. Similarly, the RJA repeal is not an ex post facto law as applied to defendant because defendant was not granted relief under the RJA prior to the repeal. In contrast, the 1868 repealing ordinance at issue in *Keith* deprived the defendant of a benefit he had already obtained.

To reach its desired outcome, the majority here expands the interpretation of ex post facto laws far beyond that described in *Keith* and beyond the interpretation of the Ex Post Facto Clause in federal cases. The majority embeds that expansive interpretation in our state constitution. Notably, as the majority itself concedes, this

Court has repeatedly held that the protection provided by our state constitution against ex post facto laws mirrors the interpretation of its federal counterpart. The majority now seems to overrule our case law and reject this notion.

The offense of first-degree murder and its punishment have not changed. *See Dobbert*, 432 U.S. at 300, 97 S. Ct. at 2302 (suggesting ex post facto comes into play only when, "under the new law a defendant must receive a sentence which was under the old law only the maximum in a discretionary spectrum of length," but "has had no effect on the defendant" when he already received the maximum punishment). Defendant here received fair warning of the range of punishment imposed for first-degree murder, particularly considering the RJA postdates defendant's offenses. Thus, the legislature acted within its constitutional prerogative in repealing the RJA. Its repeal does not constitute an ex post facto law.

The majority continues its misapplication of the correct legal standard for ex post facto laws in its analysis of the amended RJA. In the amended RJA, the General Assembly clarified the original RJA by explicitly stating that a defendant must show the allegations of improper racial influence affected his own proceeding.

The majority characterizes the amendment's changes as both procedural and substantive and therefore subverting "fundamental fairness." It holds the "alterations amending the evidentiary requirements . . . constitute changes in the criminal law that cannot be applied retroactively." It maintains "[t]hese revisions fall

within the fourth *Calder* category by altering the 'legal rules of evidence' and require a different, more stringent, standard of proof in showing the racially discriminatory imposition of the death penalty." The case relied upon by the majority for this proposition, *Carmell v. Texas*, 529 U.S. 513, 120 S. Ct. 1620 (2000), clearly frames the fourth *Calder* category in terms of prohibiting laws that retroactively lower the burden of proof required for proving the *commission* of the offense or increasing its punishment "*to facilitate an easier conviction*," thereby "making it easier to meet the threshold for overcoming the presumption" of innocence, *id.* at 532, 120 S. Ct. at 1633. When viewed in its proper context, it is protecting against *those* types of retroactive laws that preserves "fundamental fairness."

> *Calder*'s fourth category addresses this concern precisely. A law reducing the quantum of evidence *required to convict* an offender is as grossly unfair as, say, retrospectively eliminating an element of the offense, increasing the punishment for an existing offense, or lowering the burden of proof. In each of these instances, the government *subverts the presumption of innocence* by reducing the number of elements it must prove *to overcome that presumption*; by threatening such severe punishment so as to induce a plea to a lesser offense or a lower sentence; or *by making it easier to meet the threshold for overcoming the presumption*. Reducing the quantum of evidence necessary *to meet the burden of proof* is simply another way of achieving the same end. All of these legislative changes, in a sense, are mirror images of one another. In each instance, the government refuses, after the fact, to play by its own rules, altering them in a way that is advantageous only to the State, *to facilitate an easier conviction*. There is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances

> under which it can deprive a person of his or her liberty or life.

*Id.* at 532–33, 120 S. Ct. at 1632–33 (emphases added) (internal citation and footnotes omitted).

The quantum of proof required to convict for the offense of first-degree murder or to recommend the death penalty has not been changed. For the same reasons previously discussed, the RJA in its original form or as amended did not change the nature of the crime of first-degree murder, the elements to prove that crime, or the range of its punishment. Neither its amendment, nor its later repeal, violated the prohibition against ex post facto laws. However, the majority's broad reading of the original RJA creates significant constitutional separation-of-powers issues, granting the judiciary the power to make capital punishment policy.

V.

If broadly interpreted and applied, as the majority does, the original RJA is unconstitutional because, through it, the General Assembly delegated its legislative policymaking authority to the judiciary. Since 1776 our state constitution has provided that each branch of government has a distinct function. N.C. Const. of 1776, Declaration of Rights, § IV; *see* N.C. Const. art. I, § 6; N.C. Const. of 1868, art. I, § 8. Among those functions, the General Assembly is the policymaking body; the judiciary adjudicates cases. Article I, Section 18 of the state constitution provides that the courts are open to address wrongs done to a person. N.C. Const. art. I, § 18. Thus,

courts determine specific controversies based on the evidence relevant to the particular case. *See McCleskey*, 481 U.S. at 302, 107 S. Ct. at 1772–73 (reviewing and approving of new statutory measures to, *inter alia*, ensure individualized assessments for each defendant's punishment).

Accountable to and representative of the people, N.C. Const. art. II, §§ 2– 5, "[t]he legislative branch of government is without question 'the policy-making agency of our government' " and is "a far more appropriate forum than the courts for implementing policy-based changes to our laws," *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004) (quoting *McMichael v. Proctor*, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956)). The legislative branch conducts its business through the passing of statutes reflecting the policymaking decisions of the currently sitting General Assembly. "[I]dentified as [the legislature's] members are, with the other citizens of the community, and faithfully representing their feelings and interests, we can never allow ourselves to think that the acts proceeding from them can be designed for any other purpose than the promotion of the general welfare; or can result from other than the purest and most patriotic motives." *Jones v. Crittendon*, 4 N.C. 55, 55 (1814). It is "[t]he diversity within the [legislative] branch [that] ensures healthy review and significant debate of each proposed statute, the enactment of which frequently reaches final form through compromise." *Berger*, 368 N.C. at 653, 781 S.E.2d at 261 (Newby, J., concurring in part and dissenting in part). Under our sentencing structure, the extent of punishment is a legislative policy decision. The

legislature provides procedure for capital cases and guidance to juries through aggravating factors by statute.[7] *See* N.C.G.S. § 15A-2000. It also provides for appeals, *see* N.C.G.S. §§ 7A-25 through -32, and post-conviction relief and remedies by statute, s*ee* N.C.G.S. §§ 15A-1411 through -1422.

Applying the majority's sweeping interpretation of the RJA, if a court finds evidence that race was a significant factor in the imposition of a capital sentence "in the county, the prosecutorial district, the judicial division, or the State," Original RJA, § 1, 2009 N.C. Sess. Laws at 1214, a defendant's capital sentence is changed to life without the possibility of parole, even if the misuse of race was completely unrelated to the defendant or his case. If affirmed on appeal, then that ruling could control all other challenges under the RJA. In other words, all death sentences imposed before the RJA repeal could be changed to life without the possibility of parole. It would not matter that the particular defendant's proceeding was completely untainted by racial considerations. Whether courts should use statewide statistical studies to determine capital punishment policy is precisely the question answered by

---

[7] *See McCleskey*, 481 U.S. at 305–06, 107 S. Ct. at 1774 (summarizing the case law consensus for the "constitutionally permissible range of discretion in imposing the death penalty" that state legislatures may allow decisionmakers at trial, including the use of aggravating factors); *Zant*, 462 U.S. at 878–79, 103 S. Ct. at 2743–44 (The legislature defines the aggravating factors and the factors circumscribe the class of persons eligible for the death penalty; the jury "makes an individualized determination on the basis of the character of the individual and the circumstances of the crime."); *see also Osborne*, 557 U.S. at 72–73, 129 S. Ct. at 2322 (The state legislature primarily bears the task of harnessing DNA's power to prove actual innocence by creating workable post-conviction measures within the established criminal justice system.).

the Supreme Court of the United States in *McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756 (1987).

There the Supreme Court considered whether a court is the proper venue to utilize a statistical study, which purported to show a disparity in those defendants receiving a death sentence based on the race of the victim and, to a lesser extent, the race of the defendant. McClesky claimed that the study proved Georgia's capital sentencing process was administered in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments of the United States Constitution. McClesky argued that the statistical study "compel[led] an inference that his sentence rests on purposeful discrimination" without regard to the facts of his particular case. *Id.* at 293, 107 S. Ct. at 1767. Like defendant's claim here, McClesky's argument could extend to all capital cases in his state and, "[i]n its broadest form, . . . extends to every actor in the Georgia capital sentencing process, from the prosecutor who sought the death penalty and the jury that imposed the sentence, to the State itself that enacted the capital punishment statute and allows it to remain in effect despite its allegedly discriminatory application." *Id.* at 292, 107 S. Ct. at 1767. Such broad accusations cannot be effectively rebutted, not because they are necessarily true, but because it is practically impossible to show they are *not* true. *See id.* at 296, 107 S. Ct. at 1769.

The Supreme Court declined "to accept the likelihood allegedly shown by the [statistical] study as the constitutional measure of an unacceptable risk of racial

prejudice influencing capital sentencing decisions." *Id.* at 309, 107 S. Ct. at 1776. It

then classified the role of making such an assessment based on a statistical study as

a legislative function:

> McCleskey's arguments are best presented to the legislative bodies. It is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes. It is the legislatures, the elected representatives of the people, that are "constituted to respond to the will and consequently the moral values of the people." Legislatures also are better qualified to weigh and "evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts."

*Id.* at 319, 107 S. Ct. at 1781–82 (first quoting *Furman,* 408 U.S. at 383, 92 S. Ct. at

2800 (Burger, C.J., dissenting); then quoting *Gregg,* 428 U.S. at 186, 96 S. Ct. at

2931). "It is the ultimate duty of courts to determine on a case-by-case basis whether

these laws are applied consistently with the Constitution." *Id.* at 319, 107 S. Ct. at

1782. Through its lawmaking and policymaking power, the legislature has the

prerogative to criminalize conduct and outline the extent of its punishment; that

statutory guidance then directs the judiciary, and the judiciary follows these rules.

"[L]egislatures necessarily have wide discretion in the choice of criminal laws and

penalties." *Id.* at 298, 107 S. Ct. at 1770. Thus, the reasoning of *McCleskey* did not

invite legislatures to authorize courts to utilize statistical studies and make statewide

capital punishment policy. To the contrary, the Supreme Court emphasized that the

judiciary should confine itself to making individual assessments on a case-by-case

basis. The potential scope and the breadth given the RJA by the majority is derived from a fundamental misunderstanding of the holding in *McCleskey*.

The majority's interpretation of the RJA ignores the plain language of *McCleskey* that legislatures, not courts, are equipped to evaluate statistical information and enact policies based on that information. Courts are designed to determine specific controversies, not formulate policies. The majority's broad reading of the RJA seems to ask the question: Should North Carolina have capital punishment if there exists evidence that race may have been a significant factor in the process anywhere in the State? Answering this question is a quintessential legislative act. A judicial function is to ask whether race was a significant factor in *a particular defendant's case*. Courts are not the vehicle for policy decisions. Whether there should be a death penalty in North Carolina is a decision for the people, through their elected representatives, or directly by them through a constitutional amendment. Thus, it is improper for the majority to interpret the RJA as delegating legislative responsibility to the judiciary.

Courts are required to interpret statutes in a constitutional manner whenever possible. *See, e.g.*, *State v. Barber*, 180 N.C. 711, 712, 104 S.E. 760, 761 (1920) ("It is among the accepted rules of statutory construction that the courts are inclined against an interpretation that will render a law of doubtful validity."); *State v. Pool*, 74 N.C. 402, 405 (1876) ("Whenever an act of the Legislature can be so construed and applied, as to avoid conflict with the constitution, and give it the force of law, such

construction will be adopted by the courts."). Thus, to comply with separation of powers and avoid placing the judiciary in a legislative role, the RJA should be interpreted in such a manner that any relief arising from a finding that race played an improper role must be related to the particular defendant who raises the claim. The stated purpose of the RJA is that "[n]o person shall be subject to or given a sentence of death or shall be executed pursuant to any judgment that was sought or obtained on the basis of race." Original RJA, § 1, 2009 N.C. Sess. Laws at 1214. This provision illustrates the General Assembly's intent that a showing that any misuse of race must have been relevant to the particular defendant's case. This is precisely what the amended RJA attempted to clarify.

The Racial Justice Act did not change the punishment for first-degree murder. It is a procedural, not a substantive, law. Its repeal did not violate the prohibition against ex post facto laws. The repeal should be upheld. I respectfully dissent.